# UNITED STATES COURT OF APPEALS
# FOR THE FIRST CIRCUIT
_____

No. 23-1165

## NATALE COSENZA,

*Plaintiff – Appellant,*

v.

## CITY OF WORCESTER, MA,

*Defendant – Appellee,*

T.J. COAKLEY; MARK RICHARSON; ALLAN BURNES; DANIEL BENEDICT; BRIAN DONOHUE; ROBERT TURGEON; DAVID GRADY; DARLENE ROCHEFORD; AS YET UNKNOWN WORCESTER POLICE OFFICERS, KERRY HAZELHURST; JOHN DOHERTY,

*Defendants.*
_____

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS,
CASE NO. 4:18-CV-10936-TSH
_____

## BRIEF OF DEFENDANT-APPELLEE CITY OF WORCESTER
_____

Douglas T. Radigan (BBO No. 105561)
Brian J. Edmonds (BBO No. 1211590)
BOWDITCH & DEWEY, LLP
311 Main Street
P.O. Box 15156
Worcester, MA 01615-0156
Telephone: (508) 926-3497
E-mail: dradigan@bowditch.com
        bedmonds@bowditch.com

Dated: May 7, 2024

i

# TABLE OF CONTENTS

Page(s)

TABLE OF CONTENTS ............................................................................. ii

TABLE OF AUTHORITIES ....................................................................... iii

REASONS WHY ORAL ARGUMENT SHOULD BE HEARD ........................ 1

JURISDICTIONAL STATEMENT ............................................................... 2

STATEMENT OF THE ISSUES PRESENTED FOR REVIEW ........................ 3

STATEMENT OF THE CASE ...................................................................... 4

SUMMARY OF ARGUMENT ..................................................................... 18

ARGUMENT ............................................................................................ 20

      I.      STANDARD OF REVIEW .......................................................... 20

      II.     MONELL CLAIMS. ................................................................ 23

      III.    THE DISTRICT COURT CORRECTLY DISMISSED
      COSENZA'S MONELL CLAIMS AGAINST THE CITY .................... 27

CONCLUSION ........................................................................................ 48

CERTIFICATE OF COMPLIANCE ............................................................ 50

CERTIFICATE OF SERVICE .................................................................... 51

ADDENDUM .......................................................................................... 52

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

Abraham v. City of Woburn, 383 Mass. 724, 421 N.E.2d 1206 (1981)...................9

Alston v. Town of Brookline Massachusetts, 308 F. Supp. 3d 509 (D. Mass. 2018) ...................................................................................................................38

Anderson v. Liberty Lobby, Inc., 477 U.S. 242 (1986)..........................................22

Bannon v. Godin, No. 22-1958, 2024 WL 1715001, at *32 (1st Cir. Apr. 22, 2024) ........................................................................................................ 26, 39, 47

Board of the Cnty. Comm'rs v. Brown, 520 U.S. 397 (1997).............. 24, 30, 44, 45

Bordanaro v. McLeod, 871 F.2d 1151 (1st Cir. 1989) ..................................... 36, 45

Caban Hernandez v. Philip Morris USA, Inc., 486 F.3d 1 (1st Cir. 2007) .. 4, 20, 21

City of Canton v. Harris, 489 U.S. 378 (1989)................................................ passim

Com. v. Noble, 417 Mass. 341, 629 N.E.2d 1328 (1994) ........................................9

Commonwealth v. Cosenza, 65 Mass. App. Ct. 1127, 844 N.E.2d 720 (2006) (unpublished) ...................................................................................................15

Connick v. Thompson, 563 U.S. 51 (2001) ..................................................... passim

Dupree v. Younger, 598 U.S. 729 (2023) ..............................................................21

Echavarria v. Roach, 565 F. Supp. 3d 51 (D. Mass. 2021) ...................................24

Farmer v. Brennan, 511 U.S. 825 (1994)...............................................................29

Field v. City of Chicago, 981 F.3d 534 (7th Cir. 2020) .................................. 42, 43

Geoffroy v. Town of Winchendon, Massachusetts, 959 F.3d 1 (1st Cir. 2020)......21

Glisson v. Indiana Department of Correction, 849 F.3d 372 (7th Cir. 2017) .........43

Gray v. Cummings, 917 F.3d 1 (1st Cir. 2019) ............................................... passim

*Haley v. City of Boston*, 657 F.3d 39 (1st Cir. 2011)......................................... 39, 43

*Howell v. Wexford Health Sources, Inc.*, 987 F.3d 647 (7th Cir. 2021).................24

*Hutcheson v. Dallas Country, Texas*, 994 F.3d 477 (5th Cir. 2021) ......................32

*J.K.J. v. Polk County*, 960 F.3d 367 (7th Cir. 2020) .................................................42

*Lawton v. State Mut. Life Assur. Co. of America*, 101 F.3d 218 (1st Cir. 1996)...27

*Lipsett v. University of Puerto Rico*, 864 F.2d 881 (1st Cir. 1988) ................. 29, 30

*Long v. City of Los Angeles*, 442 F.3d 1178 (9th Cir. 2006) .................................43

*Maldonado-Denis v. Castillo-Rodriguez*, 23 F.3d 576 (1st Cir. 1994) ........... 29, 31

*Mandel v. Bos. Phoenix, Inc.*, 456 F.3d 198 (1st Cir. 2006)........................ 4, 20, 21

*Mesnick v. Gen Elec. Co.*, 950 F.2d 816 (1st Cir. 1991) .......................................23

*Monell v. Department of Social Services of New York City*, 436 U.S. 658 (1978) ..................................................................................................................... passim

*Mulvihill v. Top-Flite Golf Co.*, 335 F.3d 15 (1st Cir. 2003) .................... 21, 22, 23

*Natale v. Camden County Correctional Facility*, 318 F.3d 575 (3rd Cir. 2003).....43

*Noviello v. City of Boston*, 398 F.3d 76 (1st Cir. 2005) ............................ 20, 21, 22

*Oklahoma City v. Tuttle*, 471 U.S. 808 (1985) .......................................................29

*Pinshaw v. Metro. Dist. Comm'n*, 402 Mass. 687, 524 N.E.2d 1351 (1988) ........39

*Ruiz v. Bally Total Fitness Holding Corp.*, 496 F.3d 1 (1st Cir. 2007) .................23

*Salmon v. Lang*, 57 F.4th 296 (1st Cir. 2022) ........................................................23

*Santiago v. Fenton*, 891 F.2d 373 (1st Cir. 1989)........................................... passim

*Scott v. Harris*, 550 U.S. 372 (2007) .....................................................................22

*Taylor v. Hughes*, 26 F.4th 419 (7th Cir. 2022) .....................................................31

*Terrell v. Town of Woodworth*, No. 23-30510, 2024 WL 667690 (5th Cir. Feb. 19, 2024)......................................................................................................................24

iv

<u>U.S. Sec. & Exch. Comm'n v. Lemelson</u>, 57 F.4th 17 (1st Cir. 2023) .....................4

<u>Ungar v. Arafat</u>, 634 F.3d 46 (1st Cir. 2011)............................................................23

<u>Valdez v. Macdonald</u>, 66 F.4th 796 (10th Cir. 2023).............................................21

<u>Vasquz v. Lopez-Rosario</u>, 134 F.3d 28 (1st Cir. 1998)..........................................22

<u>Voutour v. Vitale</u>, 761 F.2d 812 (1st Cir. 1985).................................................4, 20

## <u>Statutes</u>

28 U.S.C. § 1291 ..........................................................................................................3

28 U.S.C. § 1331 ..........................................................................................................3

28 U.S.C. § 1367 ..........................................................................................................3

42 U.S.C. § 1983 .................................................................................................. passim

## <u>Other Authorities</u>

Massachusetts Model Jury Instructions for Use in the District Court (2009) ...........9

## <u>Rules</u>

Federal Rule of Appellate Procedure 34......................................................................1

Federal Rules of Civil Procedure 30(b)(6) .................................................................5

Federal Rules of Civil Procedure 56 (c) ...................................................................23

First Circuit Rule 34.0.................................................................................................1

## <u>REASONS WHY ORAL ARGUMENT SHOULD BE HEARD</u>

Pursuant to Federal Rule of Appellate Procedure 34(a)(2) and First Circuit Rule 34.0(a), Defendant-Appellee, City of Worcester ("Worcester" or the "City"), respectfully submits that oral argument will assist the Court in resolving this appeal. This appeal addresses municipal liability for the acts of two police officers, based upon a robust summary judgment record. Oral argument will assist the Court in its consideration of this appeal, by clarifying the relevant underlying facts and reviewing the relevant law.[1]

---

[1] Plaintiff-Appellant, Natale Cosenza, did not include a statement of reasons either for or against oral argument in his brief.

## JURISDICTIONAL STATEMENT

To the extent that Plaintiff-Appellant, Natale Cosenza's ("Cosenza") jurisdictional statement actually addresses the issue of jurisdiction, Worcester generally agrees.[2] See BB-1-5. Cosenza brought claims against Worcester Police Officers, Kerry Hazelhurst & John Doherty (individually "Hazelhurst" and "Doherty;" collectively the "Officers") and the City[3] pursuant to 42 U.S.C. § 1983 in the United States District Court for the District of Massachusetts (the "District Court") on May 10, 2018. RA-9. Cosenza sought to hold Worcester liable for harms resulting from the actions of the Officers. RA-4965-4966, 4980. On November 4, 2021, the District Court granted Worcester's motion for summary judgment ("Motion" or "Summary Judgment Motion" or "Motion for Summary Judgment") and dismissed all counts against it. RA-21. See RB Add. at 30. The remaining claims against the Officers proceeded to trial where a jury found the Officers liable and awarded Cosenza compensatory and punitive damages. RA-29,

---

[2] Citations to the Plaintiff-Appellant's Brief are listed as "BB" while citations to the City's Brief are listed as "RB." Record citations are to the nine volume Record Appendix ("RA") that was jointly prepared in consolidated appeals 23-1123 and 23-1165, to this Court's dockets ("App. Dkt. No. 23-1123" or "App. Dkt. No. 23-1165" respectively), or the Addendum appended to this Brief ("RB Add.").

[3] Cosenza also brought claims against others involved in the underlying criminal investigation, however those claims were dismissed, and the dismissal of those claims was not appealed. See RA-21, 2704, 2708. Therefore, said claims are not discussed in detail herein.

4102. The verdict entered on September 30, 2022. RA-29, 4102. After post-judgment motions, the District Court entered final judgment in favor of Cosenza on January 9, 2023. RA-32. <u>See</u> RB Add. at 31. Cosenza filed a notice of appeal regarding the allowance of Worcester's Motion for Summary Judgment on February 15, 2023. RA-32.

Cosenza only appeals the entry of summary judgment on the claim he brought against the City pursuant to 42 U.S.C. § 1983 ("§ 1983") as interpreted by the United States Supreme Court's decision in <u>Monell v. Department of Social Services of New York City</u>, 436 U.S. 658 (1978) and its progeny. The District Court had federal question jurisdiction over Cosenza's federal claims pursuant to 28 U.S.C. § 1331 and jurisdiction, pursuant to 28 U.S.C. § 1367, over Cosenza's state law claims, which are not relevant to this appeal. This Court has jurisdiction over this appeal pursuant to 28 U.S.C. § 1291, as this is an appeal from a summary judgment decision of the District Court in a case in which final judgment has entered and where Cosenza filed a timely notice of appeal. RA-21, 32-33.

## STATEMENT OF THE ISSUES PRESENTED FOR REVIEW

I.      Whether the District Court properly granted summary judgment to Worcester where the summary judgment record contains no evidence that the City was deliberately indifferent to the constitutional rights of

its citizens and no evidence that the City's acts or omissions were the cause of Cosenza's injury?

## STATEMENT OF THE CASE

Since the underlying trial on Cosenza's claims against the Officers has no bearing on this appeal, what occurred at the trial and the evidence introduced at trial is irrelevant and should not have been addressed in Cosenza's brief.[4] See, e.g., Mandel v. Bos. Phoenix, Inc., 456 F.3d 198, 204 (1st Cir. 2006), citing Voutour v. Vitale, 761 F.2d 812 (1st Cir. 1985). See also Caban Hernandez v. Philip Morris USA, Inc., 486 F.3d 1 (1st Cir. 2007).

In brief, Cosenza brought a § 1983 action against the City and the Officers based on his vacated prior convictions. After the victim's identification of Cosenza

---

[4] Cosenza's contention that the trial record may be considered in this appeal, see BB-8, is entirely inaccurate. The case upon which Cosenza relies, U.S. Sec. & Exch. Comm'n v. Lemelson, 57 F.4th 17, 23 (1st Cir. 2023) ("Lemelson"), addresses the denial of a motion for judgment as a matter of law, not a motion for summary judgment. In fact, the words "summary judgment" do not appear once in the Lemelson case.

Because the Officers' appeal was voluntarily dismissed, the only issue before this Court is the correctness of the District Court's allowance of the City's Summary Judgment Motion and thus it is only the summary judgment record that is applicable. Cosenza's attempt to present and comment on trial evidence is entirely improper. The portions of the RA that contain evidence from the trial on Cosenza's claims against the Officers are currently subject to a Motion to Strike, which the City filed with this Court on April 23, 2024. See App. Dkt. No. 23-1165 at 4/23/2024; App. Dkt. No. 23-1123 at 4/23/2024. This Court should disregard all statements in Cosenza's papers that improperly cite to the trial record rather than the summary judgment record.

as the perpetrator of the crime was suppressed, the District Attorney's office declined to re-prosecute him. RA-4961-4986. The facts relevant to the convictions and to the subsequent § 1983 action, and as set forth in the summary judgment record, are as follows.

## I. Worcester's Police Policies in the Year 2000.

Worcester's Fed. R. Civ. P. 30(b)(6) deponent testified about the operations of the Worcester Police Department (the "Department") in the period before, during, and after the investigation at issue, including police training and police department policies.

He testified that police recruits received training regarding suspect identification procedures and other constitutional issues at its police academy, prior to being appointed to the police force. RA-1681-1682. This included training officers not to make suggestive comments prior to the identification, not to single out the suspect, that there were instances in which an identification procedure implicated a suspect's right to counsel, and that during a "show-up" identification the suspect should not be handcuffed or "surrounded" by police officers. RA-1682.

The deponent testified that the Department did not require further formal training after the police academy, but that further training was available at the expense of the Department. RA-1697.

The deponent testified that the Department had a policy manual that was between eight hundred (800) and nine hundred (900) pages long. RA-1690, 1694. While new officers were not explicitly instructed to read each and every policy in the policy manual, they were informed about the policies and had access to the policy manual. RA-1690. When written policies were revised, those revisions were sent out to the officers and the officers were required to "sign off that [they had] read it." RA-1690. The deponent further explained that "each person, when he graduates the academy, he is assigned to the training officer and the training officer goes over [the contents of the policy manual] with them. Shows them around the building, this is the policy manual, here's your legal books, this is the bathroom, here's where we get our radios, here we got our keys." RA-1690.

In addition to police academy training and the instructions provided by the policy manual, the deponent testified that within the Department senior officers provided junior officers with on-the-job training of the Department's "preferred practices." RA-1688, 1690-1691, 1697. These "preferred practices were usually laid out by [an officer's] official" supervisor and were intended to make sure "things were done sort of uniformly" in situations where "there was no written policy dictating it." RA-1688-1689. And while some of these preferred practices

could vary depending on the particular unit or supervisor, there would only be "some small differences."[5] RA-1688-1689.

As to photo array identifications, the Department's preferred practice at the time of the investigation at issue involved selecting the "target photograph" of the suspect and then "select[ing] a number of other photographs of persons with similar characteristics." RA-1698. The officer then "presented them to the witness and allowed them the opportunity to view all the photographs" to ultimately see if "[a]n identification was made or it was not." RA-1698, 1702. The preferred practice was that only one witness would be presented with a photo array at a time so the identification would not be contaminated. RA-1706-1707. After a witness was presented with a photo array, officers would preserve the photos in the case file. RA-1710. Additionally, officers had access to, and the ability to review, excerpts from prior cases discussing proper and improper identification procedures in order to ensure that the identification procedures that they were using were not unnecessarily suggestive. RA- 1709.

---

[5] Worcester's deponent did not explicitly characterize the "preferred practices" as unwritten policies when asked to do so. When pressed on the issue, he differentiated a preferred practice from a *written policy* by explaining that the difference was under a preferred practice officers were trained on the best practice but had some "wiggle room and the freedom to adapt and change based on the circumstances that are presented." RA-1688.

As to witness interviews, written policy required witness interviews be documented in a written report within fifteen (15) days of the interview. RA-1694-1695. There were also preferred practices for witness interviews. The preferred practices were to conduct formal witness interviews at the police station, not to have others present during the interview, not to share what other witnesses may have said with the interviewee, and to take notes during the interview so that one would not later be relying on memory. E.g., RA-1691-1692, 1705.

## II.    Factual Background

### A.    The Attack.

Cosenza's vacated convictions stem from an attack on Melissa Horgan by an assailant inside her apartment in the middle of the night on August 14, 2000.

In the early hours of that morning, Melissa Horgan ("Horgan") awoke in her apartment to a man crouched by her bed. RA-724, 726-728, 2629. The man proceeded to beat her with a hard object. RA-728. After a struggle, in which Horgan kicked the man, he fled. RA-728-730, 2626. Horgan immediately called the police and reported the incident. RA-731, 2626.

### B.    The Worcester Police Department's Immediate Response and Investigation.

The police promptly arrived at Horgan's apartment. RA-2627. Officer Daniel Benedict ("Benedict") created an incident report which included Horgan's statement that she was attacked by a white man, wearing a dark t-shirt, underwear,

8

and a white shirt around his head. RA-732, 2627. He concluded that the attacker

had entered Horgan's apartment from her roommate's bedroom, which was empty

that night. RA-2631. He observed a partial fingerprint on the window and spoke

with Horgan's neighbor, Robert Payton ("Payton"). RA-736, RA-2631, 2637.

Payton told Benedict that he had not seen anyone that night but that he was having

problems with Cosenza, who he said lived in a neighboring building, and had

recently been in the building. RA-2637. Payton told Benedict that he believed that

Cosenza had accessed the building by jumping onto a second-floor shared balcony.

RA-2637. Benedict listed Cosenza as a suspect in the incident report.[6] RA-2638.

---

[6] Cosenza's statement in his brief that Officer Benedict "Deem[ed] [him] A
Suspect Without Any Evidence" is not only a clear misstatement of fact but
demonstrates a clear misunderstanding of basic criminal law. BB at 12-13. As is
taught in a law school evidence class and the Massachusetts Model Jury
Instructions make abundantly clear, evidence may be both direct and
circumstantial. See, e.g., Massachusetts Model Jury Instructions for Use in the
District Court (2009) ("You have direct evidence where a witness testifies directly
about the fact that is to be proved, based on what he claims to have seen or heard
or felt with his own senses, and the only question is whether you believe the
witness. You have circumstantial evidence where the witness cannot testify
directly about the fact that is to be proved, but you are presented with evidence of
other facts and you are then asked to draw reasonable inferences from them"). Just
because evidence may be circumstantial does not mean that it is not evidence. This
is especially true because, in Massachusetts, circumstantial evidence standing
alone may be sufficient to sustain a conviction. See, e.g., Com. v. Noble, 417
Mass. 341, 346, 629 N.E.2d 1328, 1330 (1994) ("the probative value of
[circumstantial evidence] has long been recognized . . . and may even rise to a
level that proves guilt without any direct evidence"); Abraham v. City of Woburn,
383 Mass. 724, 729, 421 N.E.2d 1206, 1210 (1981) ("we have long adhered to the
rule that adequate proof in civil and criminal cases may come from either direct or

The Worcester Police Department's Bureau of Criminal Identification ("BCI") also investigated. RA-2632. A BCI officer arrived at the scene of the attack at approximately 5:00 AM. RA-2632. That officer took photographs and unsuccessfully tested for fingerprints. RA-2632-6233. A wooden rung from a chair was found in Horgan's bedroom. RA-2634. The rung was later tested for fingerprints but no prints were uncovered. RA-741-743, 2634-2635. After the unsuccessful testing the rung was discarded. RA-2634-2635.

Hazelhurst was assigned to investigate the attack assisted by his partner, Doherty. RA-747. Hazelhurst read Benedict's incident report and contacted Horgan to set up a meeting. RA-748. Hazelhurst saw that Cosenza was listed as a suspect in Benedict's report and Hazelhurst prepared a photo array containing Cosenza's photo for Horgan to review. RA-766, 748-749. Hazelhurst pulled photographs from the Department's database to prepare the photo array. The photos that he pulled included one of Cosenza and photographs of other men, who had similar physical characteristics to Cosenza. RA-267, 752-753, 2643.

circumstantial evidence, or both"). Payton's statements that Cosenza had previously been in the apartment building when he should not have been undoubtedly constituted circumstantial evidence from which a reasonable inference could be drawn that he perpetrated the attack on Horgan. Similar fundamental misstatements of fact and basic criminal law, far beyond zealous advocacy, appear ad nauseum throughout Cosenza's brief.

On the morning of April 15, 2000, approximately thirty (30) hours after the attack, Hazelhurst and Doherty met with Horgan to conduct the photo array. RA-756, 2642-2643. Horgan's niece was also present. Hazelhurst laid out the photo array on the table and Horgan reviewed the photos. RA-114, 758, 2643. Upon seeing Cosenza's photo, Horgan immediately became hysterical and identified him as her attacker. RA-760, 2653. After the identification, Hazelhurst told Horgan Cosenza's name and that Cosenza lived near her. RA-1945. Hazelhurst then asked Horgan to come to the police station and provide a formal statement. RA-2656. Hazelhurst did not take notes during the interview. RA-1947. Hazelhurst's interview of Horgan, in her home rather than at the police station, in the presence of others, and without taking notes was contrary to Worcester's preferred practices in place at that time. E.g., RA-1690-1692, 1698, 1710.

After Horgan's identification, Hazelhurst, Doherty, and other officers began searching for Cosenza near Horgan's apartment building. Doherty noticed someone, whom Doherty identified as Cosenza, riding a bicycle and ordered him to stop, but the person on the bicycle sped away. RA-767, 2665. One of the other officers testified in a deposition taken during this litigation that the person on the bicycle was about two hundred (200) yards away from him, that he could not identify the person as Cosenza and that it was not clear to him whether the person on the bicycle heard Doherty's command to stop. RA-767, 2665.

Later that day Horgan provided a statement to Hazelhurst at the police station. RA-768, 2238-2240, 2656. In her updated statement, Horgan gave a more detailed description of her attacker and stated that the attacker was "medium height, medium build, no tattoos . . . dark hair, medium to short length, clean cut, dark eyes." RA-2238. She described the attacker's face as "familiar but [she] did not know him." RA-2239. She also told the police that prior to the attack in question, a neighbor that she "realized now was Natale Cosenza" had previously been in her apartment building on numerous occasions. RA-2239. Specifically, Horgan stated Cosenza had once been in the building trying to collect a reward for a stolen dirt bike and another time, he had been in the building knocking on doors, including hers, asking for money. RA-2239.

At the time of the incident and Horgan's statements to the police, Cosenza, who is approximately five feet, three inches (5'3) tall, weighed approximately one hundred and twenty-five (125) pounds. RA-753, 2251, 2663. Additionally, Cosenza had medium-to short length hair in the photo that had been used in the photo array. RA-267, 754, 2245, 2263.

### C.    The Shorts.

Key evidence in the underlying criminal case and this litigation is a pair of men's athletic shorts that were recovered from Horgan's bedroom and how that evidence was handled in both the investigation and at the trial.

Immediately after the attack, Horgan left her apartment to stay at another location. RA-114, 2298. On August 16, 2000, Horgan returned to the apartment with Hazelhurst and Doherty, at which time she packed a bag of clothes, including some clothing that had been on the bedroom floor. RA-2298, 2667. A few weeks later, on September 13, 2000, Horgan removed those clothes from the bag to do laundry and found among them a pair of men's shorts that she did not recognize. RA-2298, 2667. She suspected that the shorts may have been connected to her attack because the attacker had only been wearing his underwear. RA-2298, 2667. Horgan told the police, as far as she knew, the shorts did not belong to any male who had a legitimate reason to be in her apartment. RA-116-117. The same day on which she found the shorts, Horgan called Hazelhurst and told him about them. RA-2298, 2668. Hazelhurst then picked up the shorts from Horgan. RA-2297-2299, 2667-2668. Months later, on February 20, 2001, Hazelhurst took a further statement from Horgan regarding the shorts. RA-2298-2299, 2668-2669. In her statement, Horgan stated that she had confirmed the shorts did not belong to her nephew, Michael O'Bryant, who had been staying at her apartment, her roommate's boyfriend, or her niece's husband, as she had been staying at her niece's house when she discovered the shorts. RA-2297-2299. The shorts had what appeared to be semen stains on them and were tested for DNA. Cosenza was excluded as a source of the DNA found on the shorts. RA-2300-2303, 2669.

Hazelhurst wrote a report regarding the shorts months later, on September 17, 2001. RA-1694, 2297-2299.

Hazelhurst testified at Cosenza's criminal trial that he looked for a pair of men's shorts or pants when he went to the apartment with Horgan on August 16, 2000, shortly after the attack, because the attacker had only been wearing underwear and that he did not find any. RA-2670. Horgan stated at her deposition that she did not recall the officers searching for clothing when they accompanied her back to the apartment. RA-985.

While not referenced in Horgan's statement or in Hazelhurst's report, another one of Horgan's nephews, Matthew O'Bryant ("Matthew"), and some friends, had also stayed at her apartment over the weekend of August 26, 2000, which was after Horgan packed her bag of clothes but before she discovered the shorts. RA-420, 516-517. Hazelhurst testified at Cosenza's trial that Matthew denied ownership of the shorts. RA-607.

### D. The Criminal Prosecution and Convictions.

Cosenza was charged and subsequently indicted on charges of assault with intent to rape, assault and battery by means of a dangerous weapon, and burglary. RA-775. Cosenza moved to suppress Horgan's identification and to introduce expert testimony regarding identifications but the motion judge concluded that the photo array and circumstances surrounding it were not suggestive and denied the

motion. RA-2674. Cosenza was not permitted to introduce the expert testimony at his trial. RA-2674-2675.

At Cosenza's jury trial, Horgan's identification and the shorts were hotly disputed issues. RA-2669. The Commonwealth relied upon Horgan's identification of Cosenza as her attacker while Cosenza argued that her identification was unreliable. RA-2675. As to the shorts, Cosenza argued that the shorts belonged to the true attacker and the Commonwealth argued that they belonged to someone who had stayed at the apartment after the attack. RA-2669. Additional evidence upon which the Commonwealth relied included Doherty's testimony that he saw Cosenza fleeing on a bicycle the morning after the attack. RA-2666, 2339. The jury found Cosenza guilty of assault and battery by means of dangerous weapon and armed burglary. RA-2407-2409, 2675. He received concurrent sentences of nine to ten years on the assault and battery conviction and twelve to twenty years on the armed burglary conviction. RA-2675.

### III. Relevant Post Conviction Proceedings.

Cosenza made a motion for a new trial, which was denied. His convictions and the denial of his motion for new trial were consolidated on appeal and affirmed by the Massachusetts Appeals Court. See Commonwealth v. Cosenza, 65 Mass. App. Ct. 1127, 844 N.E.2d 720 (2006) (unpublished). See also RA-296-298.

Cosenza again sought a new trial in 2015, based on both a 2013 report from the Study Group on Eyewitness Identification, convened by the Justices of the Massachusetts Supreme Judicial Court ("SJC") and other SJC decisions discussing identifications. RA-307, 312, 2675. A trial court judge granted Cosenza's motion because he had not been allowed to present expert testimony on the issue of identifications. RA-307-318, 2475-2486. Cosenza was released pending further proceedings. RA-803.

In advance of the new trial, Cosenza again moved to suppress Horgan's identification. RA-2676. Based primarily on the evolution of Massachusetts case law since the first trial, a different trial court judge suppressed the identification. RA-319-335, 2676-2677. The Commonwealth chose not to re-prosecute and entered a *nolle prosequi* in the matter. RA-2487, 2677.

As relevant to this appeal, Cosenza then brought claims under § 1983 against Hazelhurst, Doherty, and the City of Worcester. As to the City, Cosenza alleged that it was "liable for all torts committed by [the Officers] pursuant to the doctrine of *respondeat superior* . . . [and was] additionally responsible for the policies and practices of the Worcester police department." RA-4965. Cosenza claimed that insufficiencies in the City's training and policies caused the Officers to violate his constitutional rights. RA-4961-4888.

Worcester moved for summary judgment. RA-19. Apart from Cosenza's expert's report regarding the impropriety of the Officers' conduct, the summary judgment record did not include any evidence that policymakers or representatives of the City knew, or had any reason to know, that insufficiencies in its policies and training resulted in improper conduct by its police officers. The District Court allowed Worcester's motion and dismissed it from the case. RA-21, 2697. See also RB Add. at 30. The case proceeded to trial on Cosenza's claims against the Officers. RA-28-29. The jury found the Officers liable and awarded Cosenza compensatory and punitive damages. RA-29, 4102. Final judgment was entered against the Officers and both the Officers and Cosenza filed timely notices of appeal and the appeals were consolidated before this Court. RA-32-33. See RB Add. at 31. See also App. Dkt. No. 23-1123; App. Dkt. No. 23-1165. The Officers then voluntarily dismissed their appeal with prejudice, leaving the only appeal before this Court Cosenza's appeal from the District Court's allowance of Worcester's Summary Judgment Motion. See App. Dkt. No. 23-1165 at 12/17/2023, p. 2 (dismissing the Officers' appeal and stating "[t]his stipulation does not dismiss Defendant-Appellee City of Worcester, and Plaintiff-Appellant's appeal concerning Defendant-Appellee City of Worcester will remain pending"). See also App. Dkt. No. 23-1165 at 12/19/2023; App. Dkt. No. 23-1123 at 12/05/2023, 12/06/2023 and 12/06/2023.

## SUMMARY OF ARGUMENT

This Court should affirm the District Court's order granting the City's Motion for Summary Judgment because the summary judgment record contains no disputes of material fact relevant to Cosenza's <u>Monell</u> claim, no evidence that the City was deliberately indifferent to the constitutional rights of those who resided within the City and no evidence that the City's acts or omissions caused Cosenza's harm.

Cosenza's claim against Worcester is not a claim based on any affirmative unconstitutional policy or custom. Rather, he alleges that the City is liable for failing to properly train the Officers and for failing to promulgate certain policies governing their conduct. In other words, his claims are based on omissions or inaction.

Even if the summary judgment record, viewed in the light most favorable to Cosenza, showed both inadequate policies and training and constitutional violations by the Officers, Cosenza must still present evidence that Worcester is responsible for that constitutional violation to survive summary judgment. Because Cosenza's claim alleges the City's purported inaction caused the Officers to violate his constitutional rights, he must show (1) that the municipal decisionmakers either knew or should have known that its training and policies were inadequate but nonetheless exhibited deliberate indifference to the unconstitutional effects of

those inadequacies, <u>Gray v. Cummings</u>, 917 F.3d 1, 14 (1st Cir. 2019), and (2) that the municipality's inaction was the "moving force" behind the injury. <u>See</u>, e.g., <u>Santiago v. Fenton</u>, 891 F.2d 373, 382 (1st Cir. 1989). <u>Contrast</u> <u>Young v. City of Providence ex rel. Napolitano</u>, 404 F.3d 4, 26, 29 (1st Cir. 2005). <u>See also</u> <u>Connick v. Thompson</u>, 563 U.S. 51, 60 n.5 (2001). The law on this point is clear and the complete and total absence of any evidence on these points is fatal to Cosenza's claim against Worcester.

As to the requirement of deliberate indifference, Cosenza has not pointed to any pattern of constitutional violations, which is usually required to demonstrate deliberate indifference. Apart from unsupported assertions that the City should have done more, Cosenza has not presented any evidence from which a reasonable jury could conclude that City policymakers knew or should have known that its training and policies were inadequate. Without any affirmative evidence to show that the City knew or should have known about these purported inadequacies and chose not to act, a <u>Monell</u> claim cannot succeed. Because Cosenza did not present any such evidence, the City's Summary Judgment Motion was properly granted.

Cosenza's claims against the City also fail for lack of causation. The undisputed evidence in the summary judgment record demonstrates that the Officers failed to comply with practices and policies which the City had put in place. Since the Officers acted in contravention of the City's trainings and policies,

it cannot be said that insufficiencies in the City's trainings or policies were causally related to Cosenza's injury.

Therefore, it was proper for the District Court to grant Worcester's Motion for Summary Judgment and that determination must be upheld by this Court.

## **ARGUMENT**

The summary judgment record clearly establishes that there were no disputes of material fact relevant to Worcester's potential liability under Monell and based on those undisputed facts, Worcester was entitled to judgment as a matter of law.

### I.    **Standard of Review**

"An order granting summary judgment engenders de novo review. Noviello v. City of Boston, 398 F.3d 76, 84 (1st Cir. 2005). "It is common ground that appellate review of an order granting summary judgment is confined to the record before the district court at the time it made the challenged ruling." Mandel v. Bos. Phoenix, Inc., 456 F.3d 198, 204 (1st Cir. 2006), citing Voutour v. Vitale, 761 F.2d 812, 817 (1st Cir. 1985). See also Caban Hernandez v. Philip Morris USA, Inc., 486 F.3d 1, 8 (1st Cir. 2007) (in appeal from summary judgment decision "review is confined to the record that was properly before the district court at the time of its decision"). Thus, because the only issue in this appeal is whether the District Court properly granted the City's Motion for Summary Judgment, anything that occurred

after summary judgment entered is entirely irrelevant to this appeal.[7] <u>See</u>, e.g.,

<u>Mandel</u>, 456 F.3d at 204; <u>Caban Hernandez</u>, 486 F.3d at 8.

"When all is said and done, summary judgment will lie only if the 'pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.'" <u>Mulvihill v. Top-Flite Golf Co.</u>, 335 F.3d 15, 19 (1st Cir. 2003), quoting Fed. R. Civ. P. 56 (c). The "nonmovant bears 'the burden of producing specific facts sufficient to deflect the swing of the summary judgment scythe.'" <u>Noviello</u>, 398 F.3d at 84, quoting <u>Mulvihill</u>, 335 F.3d at 19. The facts offered to defeat summary judgment, "typically set forth in affidavits, depositions, and the like, must have evidentiary value; as a rule, 'evidence that is inadmissible at trial, such as inadmissible

_____

[7] This is not a situation in which the evidence at trial supersedes the summary judgment record, and the appellate arguments are evaluated in light of the character of the evidence and quality of the evidence received in the trial court. Such review only occurs where the appealing party is appealing the denial of a motion for summary judgment. Contrast <u>Dupree v. Younger</u>, 598 U.S. 729, 734 (2023) (appeal of denial of motion for summary judgment); <u>Valdez v. Macdonald</u>, 66 F.4th 796 (10th Cir. 2023) (same). It does not apply to an appeal dealing with the <u>allowance</u> of summary judgment. As courts in this Circuit, and across the country have consistently held, the review of such an order allowing a motion for summary judgment will be *de novo* and the evidence before the Court is limited to the summary judgment record that was in fact considered by the trial court when rendering its decision. <u>See</u>, e.g., <u>Geoffroy v. Town of Winchendon, Massachusetts</u>, 959 F.3d 1, 6 (1st Cir. 2020).

hearsay, may not be considered on summary judgment.'" Id., quoting Vasquz v. Lopez-Rosario, 134 F.3d 28, 33 (1st Cir. 1998).

"The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986). "Moreover, the factual conflicts relied upon by the nonmovant must be both genuine and material." Mulvihill, 355 F.3d at 19. "For this purpose, 'genuine' means that the evidence is such that a reasonable factfinder could resolve the point in favor of the nonmoving party, and 'material' means that the fact is one that might affect the outcome of the suit under the applicable law." Id. "When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." Scott v. Harris, 550 U.S. 372, 380 (2007).

"The same paradigm governs [the First Circuit's] *de novo* review of a district court's summary judgment rulings" with "one important distinction." Mulvihill, 355 F.3d at 19-20. "The court of appeals 'is not restricted to the district court's reasoning but can affirm a summary judgment on any independently

sufficient ground' made manifest in the record." Id., quoting Mesnick v. Gen Elec.

Co., 950 F.2d 816, 822 (1st Cir. 1991).[8]

## II.   Monell Claims.

42 U.S.C. § 1983 is the vehicle by which a plaintiff raises claims against a

municipality for civil rights violations. However, it has long been established that

---

[8] Cosenza dedicates many pages of his brief to allegations that Worcester "failed to meet its initial burden of showing there was no genuine dispute of material fact on Cosenza's Monell claims . . . [and, therefore] [t]he district court should have decided that Worcester had not met its initial burden and it should have denied summary judgment, without the need to even look at Cosenza's responses and evidence." BB at 37-36. This argument, focused almost exclusively on the adequacy of Worcester's memorandum of law before the District Court, is a contrivance designed to obscure the absence of any affirmative evidence to support Cosenza's Monell claims. Cosenza does not actually allege that there are material disputes of fact or that the District Court found undisputed facts where disputed facts exist. Instead, he alleges that Worcester's memorandum of law was inadequate.

Worcester's memorandum to the District Court was more than adequate and Worcester irrefutably met its burden of production, but even if Worcester's memorandum of law was insufficient, this Court is authorized to affirm an order allowing summary judgment on any grounds supported by the record. See Salmon v. Lang, 57 F.4th 296, 308 (1st Cir. 2022) ("We may affirm summary judgment on any basis apparent from the record" [quotations and citations omitted]). See also Ungar v. Arafat, 634 F.3d 46, 51 n.4 (1st Cir. 2011) ("an appellate court is not wedded to the trial court's reasoning but, rather, may affirm a judgment on any independently sufficient ground made manifest in the record"); Ruiz v. Bally Total Fitness Holding Corp., 496 F.3d 1, 5 (1st Cir. 2007) ("we bear in mind that we are not bound by the district court's decisional calculus but, rather, may affirm the decision below on any ground made manifest by the record"). As demonstrated in detail infra, there are no disputes of material fact. There is no evidence of deliberate indifference or causation in the summary judgment record, and thus the District Court's allowance of Worcester's Summary Judgment Motion must be affirmed.

23

"[a] municipality cannot be held liable solely because it employs a tortfeasor"

Monell v. Dept. of Soc. Servs. of the City of N.Y., 436 U.S. 658, 691 (1978). "The

Supreme Court concerned that municipal liability based on fault by the City might

collapse into de facto *respondeat superior*, has set a very high bar for assessing

municipal liability under Monell." Young v. City of Providence ex rel. Napolitano,

404 F.3d 4, 26 (1st Cir. 2005). In fact, it has been endlessly repeated in case law

across the country that the doctrine of *respondeat superior* is not applicable to

Monell claims against municipalities. See, e.g., Terrell v. Town of Woodworth,

No. 23-30510, 2024 WL 667690, at *10 (5th Cir. Feb. 19, 2024). (It is well

established that a city is not liable under § 1983 on the theory of *respondeat*

*superior*"); Howell v. Wexford Health Sources, Inc., 987 F.3d 647, 653 (7th Cir.

2021) ("Monell rejected the common-law theory of *respondeat superior* liability

for an employee's actions"). See also Echavarria v. Roach, 565 F. Supp. 3d 51, 90

(D. Mass. 2021), quoting Monell, 436 U.S. at 691-692. ("a municipality cannot be

held liable under § 1983 on a *respondeat superior* theory"). As the Supreme Court

has previously explained, "[C]ongress did not intend to impose liability on a

municipality unless deliberate action attributable to the municipality itself is the

'moving force' behind the plaintiff's deprivation of federal rights." Board of the

Cnty. Comm'rs v. Brown, 520 U.S. 397, 400 (1997). "[I]t is only when the

governmental employees' 'execution of a government's policy or custom . . .

inflicts the injury' and is the 'moving force' behind the constitutional violation that a municipality [such as Worcester] can be held liable" (citation omitted). <u>Young</u>, 404 F. 3d at 26.

To put it plainly, there are two means by which a plaintiff, in these circumstances, may seek to hold a municipality liable: one based on action taken and the other based on failure to act. Cosenza has not alleged the existence of any affirmative action, policy or custom attributable to the City that caused him injury. Rather, by claiming that Worcester caused him harm by failing to promulgate policies relating to the police action undertaken in the investigation and by failing to properly train the Officers he alleges that the City's inaction caused the Officers to violate his constitutional rights. E.g., BB at pp. 29-30 (stating claims against the City are based on "(1) Worcester's omission of needed policies governing the disclosure of evidence, conducting identification procedures, and interviewing victims and witnesses; and (2) the City's failure to train and supervise its officers including Hazelhurst and Doherty, on these subjects."). While Cosenza asserts that these are two separate theories of liability, the basic facts underlying each theory are the same such that only a single analysis is required, as the District Court properly recognized.

Even if the City did not sufficiently train its officers or have sufficient policies in place and the Officers violated Cosenza's constitutional rights, Cosenza

must still prove that the City's failures or omissions (1) caused the constitutional violation and (2) that the City has the requisite level of fault; that level of fault is "deliberate indifference." Young v. City of Providence ex. Rel. Napolitano, 404 F.3d 4, 26 (1st Cir. 2005). "Causation and deliberate indifference are separate requirements, although they are often intertwined in these cases."[9] Young, 404 F.3d at 26.

The deliberate indifference requirement is stringent. See, e.g., Bannon v. Godin, No. 22-1958, 2024 WL 1715001, at *19 (1st Cir. Apr. 22, 2024), quoting Connick v. Thompson, 563 U.S. 51, 61 (2011). It requires "a finding that the municipality 'disregarded a known or obvious risk of harm' in utilizing a deficient training program or in not developing a training program" or in implementing policies. Id. at *32 (Montecalvo, J., concurring). The knowledge of a known or obvious risk is essential and is ordinarily proven through a pattern of prior

_____

[9] Cosenza's argument in footnote 5 of his brief that the District Court did not discuss his Monell claim based on the failure to promulgate necessary policies is a red herring that warrants little discussion. Contrary to Cosenza's assertion, the Court did not dispose of the claim in a single sentence, nor did it impose a heightened standard of fault. BB at p. 40 n.5. Rather, when read in context, it is clear that the District Court recognized both theories of liability, relied on the same basic facts, effectively accused the City of the same inaction, and required Cosenza to demonstrate "deliberate indifference," which has been described as a "stringent standard of fault" by the United States Supreme Court. See, e.g., Connick v. Thompson, 563 U.S. 51, 61 (2011). Simply put, Cosenza makes much ado about nothing as both theories of liability require evidence of "deliberate indifference" by the City, of which there is none.

constitutional violations because "[w]ithout notice that a course of training [or certain policies are] deficient in a particular respect, decisionmakers can hardly be said to have" been deliberately indifferent. Id.

Even if a plaintiff shows deliberate indifference, he must also show that the municipality caused the injury at issue. In this context, he must show that the alleged deficiencies in training and policies were the "moving force" that "actually caused" the Officers to violate his constitutional rights. Connick, 563 U.S. at 60 n.5.

As the party with the ultimate burden of proof, Cosenza is required to point this Court to specific evidence of both deliberate indifference and causation. To survive summary judgment, he must "offer the court more than steamy rhetoric and bare conclusions" on these points. Lawton v. State Mut. Life Assur. Co. of America, 101 F.3d 218, 223 (1st Cir. 1996). And as demonstrated in detail *infra*, Cosenza has failed to meet this burden.

### III.   The District Court Correctly Dismissed Cosenza's Monell Claims Against The City.

What Cosenza is attempting to do is exactly what he alleged in his complaint: hold the City "liable for all torts committed by [the Officers] pursuant to the doctrine of *respondeat superior*." RA-4965. The District Court properly recognized that this purported Monell claim was not supported by the law or the record and properly granted summary judgment to the City where there were no

disputes of material fact and no affirmative evidence in the summary judgment record from which a jury could conclude that the City was deliberately indifferent to the constitutional rights of its inhabitants or that the City's acts or omissions caused Cosenza's harm.

### A. Cosenza Has Failed To Present Any Evidence Of Deliberate Indifference on the Part of The City.

Deficiencies in the design and implementation of police training programs may give rise to municipal liability only in those "limited circumstances" where the need for more or different training or policies is so obvious that "the failure to train amounts to <u>deliberate indifference</u> to the rights of persons with whom the police come into contact" (emphasis added). <u>City of Canton v. Harris</u>, 489 U.S. 378, 388 (1989). "That a particular officer may be unsatisfactorily trained will not alone suffice to fasten liability on the city, for the officer's shortcomings may have resulted from factors other than a faulty training program." <u>Id</u>. at 390-391. Furthermore, "adequately trained officers occasionally make mistakes; the fact that they do says little about the training program or the legal basis for holding the city liable." <u>Id</u>. at 391.

As to municipal liability in circumstances such as these, there is no question that "[a] municipality's culpability for deprivation of rights is at its most tenuous where a claim turns on a failure to train" or a failure to promulgate policies that a plaintiff claims were necessary. <u>Connick v. Thompson</u>, 563 U.S. 51, 61 (2011),

citing <u>Oklahoma City v. Tuttle</u>, 471 U.S. 808 (1985). Whether based on purported gaps in policy, or the City's failure to adequately train, the City's actions "in a relevant respect must amount to <u>deliberate indifference</u>" in order for Cosenza's claim to be viable. <u>Connick</u>, 563 U.S. at 61 (quotations omitted). Thus, in addition to a constitutional violation perpetrated by the Officers, Cosenza must show that City officials behaved in a manner that "could be characterized as supervisory encouragement, condonation, or acquiescence, or gross negligence amounting to deliberate indifference." <u>Lipsett v. University of Puerto Rico</u>, 864 F.2d 881, 902 (1st Cir. 1988). Only where the summary judgment record demonstrates that the City's alleged failure to train its officers or promulgate the purportedly necessary policies "reflects a 'deliberate' or 'conscious' <u>choice</u> by a municipality . . . can a city be liable for such failure under § 1983" (emphasis added). <u>City of Canton v. Harris</u>, 489 U.S. 378, 389 (1989).

"[P]roof of mere negligence, without more, is inadequate." <u>Maldonado-Denis v. Castillo-Rodriguez</u>, 23 F.3d 576, 582 (1st Cir. 1994); <u>see</u> <u>also</u> <u>Farmer v. Brennan</u>, 511 U.S. 825, 835 (1994) (deliberate indifference "describes a state of mind more blameworthy than negligence"). "With deliberate indifference lying somewhere between the poles of negligence at one end and purpose or knowledge at the other end, the Courts of Appeals have routinely equated deliberate indifference with recklessness." <u>Farmer</u>, 511 U.S. at 836. This standard of

"'deliberate indifference' is a stringent standard of fault requiring proof that a municipal actor disregarded a known and obvious consequence of his action." Brown, 520 U.S. at 410; Connick, 563 U.S. at 61.

A finding of deliberate indifference requires some notice to city policymakers of a particular problem because policymakers cannot make a deliberate choice "unless confronted with a problem that requires the taking of affirmative steps." Lipsett, 864, F.2d at 902. It is only "when city policymakers are on actual or constructive notice that a particular omission in their training program [or policies] causes city employees to violate citizens' constitutional rights, [that] the city may be deemed deliberately indifferent" such that Monell liability is appropriate. Connick, 563 U.S. at 61. This is because a city's "policy of inaction" in light of notice that its training program will cause constitutional violations "is the functional equivalent of a decision by the city itself to violate the constitution." City of Canton, 489 U.S. at 395.

Accordingly, Cosenza was required to present affirmative evidence in the summary judgment record, not only that the City's policies and training regimen fell short, but also that the City "knew or had reason to believe that such a regimen had unconstitutional effects." Gray v. Cummings, 917 F.3d 1, 14 (1st Cir. 2019) (police practices expert insufficient to establish a failure to train claim). This is why "[a] plaintiff [, such as Cosenza] typically must show a 'pattern of similar

constitutional violations by untrained employees . . . to demonstrate deliberate indifference for purposes of failure to train'" or harm predicated on gaps in express policies. Id., quoting Connick, 563 U.S. at 62. See also Taylor v. Hughes, 26 F.4th 419, 435 (7th Cir. 2022) (stating Monell liability based on "gaps in express policies" "typically" requires plaintiffs to "point to evidence of a prior pattern of similar constitutional violations"). "[I]solated instances of unconstitutional activity are insufficient to establish a supervisor's policy or custom, or otherwise show deliberate indifference." Maldonado-Denis, 23 F.3d at 582.

The Supreme Court has indicated that there may be some instances where a single incident would be sufficient for a finding that a municipality was deliberately indifferent but that is an extremely narrow exception to the general rule that prior instances of unconstitutional conduct are required to demonstrate deliberate indifference. Single incident liability is only available where "the need for more or different training is so obvious and the inadequacy [is] so likely to result in the violation of constitutional rights, that policy makers can reasonably be said to have been deliberately indifferent" after a single incident (emphasis added). City of Canton, 489 U.S. at 390. For example, in City of Canton, 489 U.S. at 390 n. 10, the Court hypothesized that arming police officers without training them about the use of deadly force would be a situation where deliberate indifference could be inferred after a single incident. City of Canton, 489 U.S. at 390 n. 10. The

Supreme Court's jurisprudence on this point made clear that single incident liability is reserved for "narrow" circumstances when the municipality fails to train its employees who "have <u>no knowledge at all</u> of the constitutional limits" that govern their conduct. <u>Connick</u>, 563 U.S. at 64, 67 (emphasis added). <u>See</u> <u>also</u> <u>id</u>. at 91 (Ginsberg, J. dissenting) (agreeing with majority that failure-to-train liability attached "only when the failure" involved "<u>untrained employees</u>" [emphasis added]). The Court in <u>Connick</u> specifically took the time to indicate that a presumption of "no knowledge at all" and the absence of training was critical to the <u>Canton</u> hypothetical regarding armed police officers. Which is why many courts considering single-incident liability have made it quite clear that unless there is additional evidence regarding the municipality's knowledge/notice, single incident liability can only be found in "those cases in which the government actor was provided no training whatsoever." <u>See</u>, e.g., <u>Hutcheson v. Dallas Country, Texas</u>, 994 F.3d 477, 483 (5th Cir. 2021). ("The single-incident exception 'is generally reserved for those cases in which the government actor was provided no training whatsoever'" [citation omitted]). In fact, this Court has concluded that in the absence of some additional evidence regarding the City's notice or knowledge, four hours of police academy training on constitutional law was sufficient to show that the municipality was not deliberately indifferent. <u>See</u> <u>Santiago v. Fenton</u>, 891 F.2d 373, 381-382 (1st Cir. 1989).

The case at bar is not a situation in which Cosenza has pointed to a pattern of prior conduct to show that the City was deliberately indifferent with regards to its training and policies. Rather, he seeks to hold the City liable based on a single investigation by the two investigating Officers.

In this Circuit, <u>Young v. City of Providence ex rel. Napolitano</u>, 404 F.3d 4 (1st Cir. 2005) and <u>Gray v. Cummings</u>, 917 F.3d 1 (1st Cir. 2019) provide examples of how single incident <u>Monell</u> cases either succeed or fail at the summary judgment stage. Notably, in <u>Young</u>, the plaintiff's case was allowed to go to the jury where, among other evidence, she presented some admissions from a city policymaker that the city knew about the dangers created by its inadequate training and policies, whereas in <u>Gray</u>, the absence of any affirmative evidence regarding the town's knowledge and notice was fatal to the plaintiff's claim.

In <u>Young</u>, the plaintiff's son, an off-duty Providence police officer, was shot and killed by on-duty officers when he responded to an emergency under the City's "always armed/always on-duty" policy. 404 F.3d at 9. The plaintiff produced affirmative evidence that the city had offered little-to-no training on the danger of misidentifications under the policy. <u>Id</u>. at 28-29. More importantly, the plaintiff also produced affirmative evidence straight from the mouth of the Police Commissioner, a policymaker within the city, that the policy at issue was inherently dangerous and additional trainings/protocols were necessary to avoid

friendly fire shootings of off-duty officers. Id. at 18. (Police Commissioner agreed that "always armed/always on-duty policy was inherently dangerous, and that given the department's always armed/always on-duty policy, specific training and a protocol were necessary to avoid friendly fire shootings" and "[w]here such training and policy do not exist, it can be expected that off-duty officers will intervene unwisely, that on-duty officers will mistake them for suspects, and that unnecessary blood will be shed by the public and by officers"). This evidence of knowledge and notice by a city policymaker, in addition to other testimony from training officers and others, was enough to send the deliberate indifference question to the jury without the usually required pattern of previous violations. Id. at 29 (based on Police Commissioner's testimony a jury could find "the department knew that there was a high risk that absent particularized training on avoiding off-duty misidentification, and given the department's always armed/always on-duty policy, friendly fire shootings were likely to occur").

In Gray, the plaintiff failed to overcome the lack of pattern evidence. The plaintiff in Gray, who had been diagnosed with bipolar disorder, was tased by a police officer during an on-the-street encounter. 917 F.3d at 5-7. She subsequently brough an excessive force claim, which included a failure to train claim against the municipality for deficient training of officers on interacting with people with mental illnesses. Id. at 13-14. Without any evidence of a pattern of similar

violations to support the required element of deliberate indifference, the plaintiff instead offered expert testimony on appropriate police practices for interactions with people with disabilities. Id. at 14. She then argued that the expert's opinion coupled with her own encounter with the police sufficed to overcome the town's motion for summary judgment. Id. This Court disagreed; holding that when seeking to hold a municipality liable based on a single course of conduct, a plaintiff cannot simply identify deficiencies in the municipality's training. Id. The Court explained that to survive summary judgment, the plaintiff needed to produce evidence "that the Town knew or had reason to believe that [its training] had unconstitutional effects." Id. Without this evidence, there was no genuine issue of material fact on whether the municipality was deliberately indifferent to the risk of similar constitutional violations and summary judgment in favor of the town was affirmed. Id.

Here, Cosenza's proffer is a far cry from what the Court concluded was sufficient to survive summary judgment in Young and nearly identical to what the Court deemed insufficient in Gray. His broad claims that the City completely failed to train its officers and had no policies whatsoever regarding identifications, taking witness statements, and handling evidence, has no support in the record.

In the words of the Supreme Court, "failure-to-train liability is concerned with the substance of the training, not the particular instructional format."[10] Connick, 563 U.S. at 68. It is undisputed that Worcester police officers received police academy training that included training on conducting identifications. RA-1697, 1690. It is undisputed that the Officers attended the police academy. RA-1670, 1741. The Department also had a policy manual that was between eight hundred (800) and nine hundred (900) pages long. RA-1690, 1694. When a new officer joined the police force, the training officer went over the policy manual with him or her. RA-1690. The policy manual contained policies governing officer conduct and investigative procedures, including which departments were responsible for investigating particular crimes. RA-1690. It also contained forms

---

[10] While Worcester's 30(b)(6) deponent did not characterize the City's preferred practices as "unofficial policies" when pressed, he explained that in his opinion, the only difference between a "preferred practice" and a "written policy" is that the preferred practices gave officers some "wiggle room" to adapt if a particular situation called for it. E.g., RA-1688. Notwithstanding the availability of some "wiggle room," the preferred practices described by the deponent were put in place to create some uniformity and fill gaps in the written policies. These preferred practices as described by the deponent were "so permanent and well settled as to constitute a 'custom or usage'" on par with formally promulgated policies. See, e.g., Monell v. Department of Social Services of New York City, 436 U.S. 658, 691 (1978). Cf. Bordanaro v. McLeod, 871 F.2d 1151, 1156 (1st Cir. 1989) (uncontradicted testimonial evidence from police officers of long-standing, widespread practice proves the existence of a custom or usage). Cosenza's own expert had this same understanding, as his report specifically critiqued and criticized the Officers for not complying with the preferred practices that were in place. RA-1448, 1457-1456.

that the officers would be required to fill out and was regularly updated. RA-1690. When the policy manual was updated, the updates were provided to officers who were required to sign off that they had read the update. RA-1690. Worcester also provided it officers with guidance from, and access to, case law on constitutional issues, such as identifications. RA-1697, 1690, 1709.

As to the issues upon which Cosenza focuses his claim, Worcester had systems in place by which more senior officers provided guidance and instruction to junior officers. These "preferred practices" and "on the job" training were explicitly acknowledged by Cosenza's expert. RA-1458.

As Worcester's 30(b)(6) deponent explained, the City had "preferred practices" in place "that were usually laid out by your official" supervisor and most training and explanations on these practices "were done verbally." E.g., RA-1688-1690. Moreover, as the deponent explained, "each person when he graduates the academy, he is assigned to the training officer and the training officers goes over all of [the policies with them] . . . if there was ever a policy revision, those policies were sent out, and you had to sign off that you've [sic] had read it." RA-1690.

Despite Cosenza's assertions to the contrary, this is not the same as having no training or policies whatsoever. And the undisputed evidence of these preferred practices and "on the job" training "without more, does not amount to" the "deliberate indifference' or 'conscious' choice by the [City]" that is required to

demonstrate "deliberate indifference." <u>See</u> <u>Santiago</u>, 891 F. 2d at 381-382

("without more" evidence of the City's deliberate indifference, four hours of police

academy training on constitutional issues was sufficient to demonstrate the city

was not deliberately indifferent in its training). The "more" that is required is some

affirmative evidence that the City "knew or should have known" about

insufficiencies in its training and policies. <u>See</u>, e.g., <u>Gray</u>, 917 F.3d at 14.

It is telling that, rather than discussing the true issue of whether the City had

this notice, Cosenza specifically alleged, and continues to argue, that Worcester is

"liable for all torts committed by [the Officers] pursuant to the doctrine of

*respondeat superior*" (emphasis in original) in plain contradiction of long standing

jurisprudence on municipal liability. RA-4965. <u>See</u>, e.g., <u>Alston v. Town of</u>

<u>Brookline Massachusetts</u>, 308 F. Supp. 3d 509, 532 (D. Mass. 2018), citing

<u>Monell</u>, 436 U.S. at 691 ("It is axiomatic that a municipality cannot be held liable

on a theory of *respondeat superior* just because it employs a tortfeasor"). Cosenza

has simply worked backwards with the benefit of hindsight and relied solely on the

improper actions of the Officers who investigated him to attempt to hold the City

vicariously liable for the Officers' actions.[11]

---

[11] It should be noted that in Cosenza's brief addresses the jury verdict against the
Officers and states that the City "has taken the position that it would not indemnify
any part of the judgment." BB at 26-27. This statement, and other such references
relating to the issue of indemnification, have no relevance or purpose in this appeal

The summary judgment record contains no affirmative evidence from which a reasonable juror could conclude that the City knew or should have known about any purported inadequacies and failed to correct them. The City did not have an affirmative policy or custom of encouraging unconstitutional behavior. Nor did it dispatch the Officers into the field with zero training. Contrast <u>Haley v. City of Boston</u>, 657 F.3d 39, 51-52 (1st Cir. 2011) (complaint alleged <u>Monell</u> liability based on "a standing BPD policy, under which Boston police officers regularly kept helpful evidence from criminal defendants"); <u>Young v. City of Providence ex Rel., Napolitano</u>, 404 F.3d 4, 27 (1st Cir. 2005) (reversing summary judgment on <u>Monell</u> "failure to train" claim based in part on genuine dispute of fact as to whether the officers were trained at all on risks of friendly fire). Rather, the City's police academy provided base training and upon joining the force, officers were taught preferred practices by their supervisors. <u>See</u> <u>Bannon v. Godin</u>, No. 22-1958, 2024 WL 1715001, at *32 (1st Cir. Apr. 22, 2024) (Montecalvo, J., concurring).

---

apart from insinuating that Worcester has somehow been a bad actor during this litigation. Notably, Cosenza's counsel successfully pressed and received a large award of punitive damages against the Officers in the underlying litigation, RA-4102, 4986, and Worcester is prohibited from indemnifying the Officers as a matter of law because of the punitive damage award. <u>See</u>, e.g., <u>Pinshaw v. Metro. Dist. Comm'n</u>, 402 Mass. 687, 696-697, 524 N.E.2d 1351, 1357-1358 (1988). RA-4102, 4986. Worcester has in no way acted in bad faith at any point in this litigation. Rather, the relief sought by Cosenza's counsel resulted in Cosenza obtaining a jury verdict which Massachusetts law plainly and explicitly prohibits the City from contributing to in whole or in part. <u>Id</u>.

There is no pattern of prior unconstitutional conduct and there is no testimony from policymakers that the City knew or had any reason to know that the policies and procedures in place were potentially problematic. Contrast <u>Young</u>, <u>supra</u>.

The only part of the summary judgment record that Cosenza has advanced to purportedly show the City's deliberate indifference are the broad statements of his police practice's expert. <u>See</u> BB at 44-46, 54-55. The expert's conclusions regarding the City's knowledge/notice are brief and conclusory. RA-1457-1458. In fact, the only relevant sentences of the expert's report that deal with the purported inadequacy of Worcester's policies and trainings states:

> The nationally accepted standard of law enforcement practice in 2000 was to identify evidence, photograph the evidence before it is moved or recovered, provide a chain of custody for the evidence, and before discarding evidence involved in an on-going matter seek permission from a prosecutor prior to discarding or destroying said evidence. . . . The requirements for conducting fair and objective investigations involving photo identifications were widely known and accepted in the 1990's as best practice established as a nationally accepted standard of law enforcement practice . . . . The inherent dangers and damage to innocent parties were also known when these procedures were not followed. Despite this information being readily available, the Worcester PD failed to establish formal policies to conduct investigations involving photo identification procedures and failed to provide formal training for investigative personnel to ensure proper performance and consistency.

RA-1456-1457.

The expert's conclusions that the City knew about the purported inadequacies is purely speculative and unsupported. His report lists the preferred practices that were in place and how the Officers at issue deviated from those

practices before ultimately making a final broad unsubstantiated conclusion that "it was incumbent upon the Worcester PD to ensure that all investigative personnel received appropriate training to ensure the procedures used were fair, objective, and consistent with nationally accepted standards of law enforcement practice." RA-1457-1458.

To survive summary judgment, Cosenza had the burden of pointing to specific evidence of deliberate indifference. But all he has pointed to are the speculative opinions of his expert which is not sufficient to survive summary judgment. As this Court made clear in Gray, broad "assertions [in expert reports] are insufficient to support" or create disputes of material fact as to the required element of deliberate indifference. Gray, 917 F.3d at 14.

"It is not enough to show that the [City's] training regimen was faulty" or that it should have enacted different or more robust policies. Id. "[The Plaintiff] must also show that the [City] knew or had reason to believe that [its informal method of training police officers] had unconstitutional effects" which is why a Plaintiff, such as Cosenza is normally required to show other instances of unconstitutional behavior. Id. Relying solely on the purported injustices done to him in the absence of other evidence is entirely insufficient. Id.

Just like the plaintiff in Gray, "[Cosenza] has tendered no evidence of past violations sufficient to put the [City] on notice of such [unconstitutional] effects."

Id. Rather the only piece of evidence that he cites to in order to show the City's

deliberate indifference is the opinion of his expert, BB at 44-47, 54-56, and there is

nothing in the record that can close the gap and connect the expert's opinion to

City policymakers. Contrast Young, 404 F.3d at 18-19, 28-29. This necessarily

ends the Court's inquiry. Gray, 917 F.3d at 13-14.

"Given this yawning gap in [his] proof, [Cosenza] has not made a genuine

issue of material fact as to whether the [City] was deliberately indifferent to the

risk of the alleged constitutional violation." Id. To hold otherwise would allow

Monell liability to impermissibly lapse into *respondeat superior*. Consequently,

Cosenza's claims for failure to train and failure to promulgate appropriate policy

were properly dismissed and therefore the District Court's allowance of

Worcester's Motion for Summary Judgment must be affirmed. Id.[12]

---

[12] While Cosenza points to numerous cases that purportedly support his claims, they are neither analogous nor applicable. Nearly all of them are not from this Circuit and most of them involve actual evidence regarding affirmative policies of inaction or, where inaction was alleged, actual evidence that the municipality had some notice and still failed to take corrective action. See J.K.J. v. Polk County, 960 F.3d 367, 382 (7th Cir. 2020) (affirming jury verdict finding municipality liable for gaps in policies relating to sexual assault where there was evidence presented that the municipality "was aware of sexual misconduct happening with its jail, rendering the risk to female inmates far from hypothetical"); Field v. City of Chicago, 981 F.3d 534, 562-563 (7th Cir. 2020) (affirming jury verdict against the City for Monell claim based on failing to promulgate policies where plaintiff "presented evidence of similar violations that provided notice to the City" and "evidence that the City did not introduce policies sufficient to correct those known deficiencies"); Glisson v. Indiana Department of Correction, 849 F.3d 372 (7th Cir.

## B. The Record is Bereft of Any Evidence That The City's Failures Or Omissions Caused Cosenza's Injury.

Cosenza's claims also fail for lack of causation. In order to sustain a <u>Monell</u>

claim "the identified deficiency in a city's training program must be closely related

---

2017) (affirming jury verdict against municipality where evidence showed that municipality "had notice of the problems posed by" the absence of certain policies and "despite that knowledge . . . did nothing for more than seven years to address that risk"). Moreover, as to the procedural differences at play, none of the cases upon which Cosenza relies were both decided on summary judgment and involved a record that was entirely bereft of any evidence that would allow a finding of deliberate indifference. Rather those cases were decided on either a motion for judgment on the pleadings where the complaint sufficiently alleged deliberate indifference, where the summary judgment record contained affirmative evidence of deliberate indifference, or after a jury verdict where affirmative evidence of deliberate indifference was presented to a jury. Contrast <u>Haley v. City of Boston</u>, 657 F.3d 39 (1st Cir. 2011) (reversing dismissal for failure to state claim where court "must take the complaint's factual allegations as true" and thus reversed because "the complaint alleg[ed] that the detectives withholding of [evidence] occurred pursuant to a standing BPD policy, under which Boston police officers regularly kept helpful evidence from criminal defendants"); <u>Natale v. Camden County Correctional Facility</u>, 318 F.3d 575, 584-585 (3rd Cir. 2003) (reversing summary judgment in favor of the municipality where the plaintiff has proffered "the testimony of a witness who testified from personal knowledge about the policy for assessing the medical needs of inmates, and the gap in procedure for patients with immediate and serious medical needs"); <u>Field</u>, 981 F.3d at 562-563. That is not the case here because there is no affirmative evidence that would support a finding of deliberate indifference and simply citing to cases where the plaintiff was able to produce the necessary evidence will not change that.

While <u>Long v. City of Los Angeles</u>, 442 F.3d 1178 (9th Cir. 2006) upon which Cosenza relies may appear analogous, it cannot be squared with the law of this Circuit. As clearly articulated in <u>Gray</u>, <u>supra</u>, that reliance solely on an expert opinion is insufficient to demonstrate that the City had notice of the potential constitutional violations. Thus, that case and any argument made in reliance upon it is not entitled to any consideration here.

to the ultimate injury." <u>City of Canton</u>, 489 U.S. at 391. More importantly, a

plaintiff bringing such a claim must also show the purported deficiency was the

"moving force" that actually caused the claimed deprivation of constitutional

rights. <u>See</u> <u>Connick</u>, 563 Mass. at 60-61 & n.5 (causation analysis required

determining "whether the alleged deficiency, or some other cause was the moving

force, . . . that actually caused the failure to disclose the crime lab report"

[quotations and citations omitted]). <u>See</u> <u>also</u> <u>Santiago v. Fenton</u>, 891 F.2d 373, 382

(1st Cir. 1989), quoting <u>Monell</u>, 436 U.S. at 694. Thus, in order to survive

summary judgment, there needed to be affirmative evidence in the record that

demonstrated a causal connection between the City's purportedly inadequate

omissions and the harm that occurred. In other words, the City's acts or omissions

must be closely related to the injury caused by the Officers and the reason for their

unconstitutional action.

Here, there is no evidence in the summary judgment record from which a

reasonable jury could have concluded that the City's purported failure to

promulgate necessary policies and purportedly inadequate training was the

"'moving force' behind the plaintiff's deprivation of federal rights." <u>Brown</u>, 520

U.S. at 400 (1997).

The required "connection needs to rise above a mere but/for coupling

between cause and effect." <u>Bordanaro v. McLeod</u>, 871 F.2d 1151, 1156 (1st

Cir.1989). Rather, affirmative evidence in the summary judgment record must support "a direct causal link between the municipal action [or inaction] and the deprivation of federal rights." Brown, 520 U.S. at 404. Cosenza cannot rely on mere allegations that lack of training and absence of policies caused his harm in order to survive summary judgment. He must point to admissible record evidence of causation in order to show that the alleged deficiency is "closely related to the ultimate injury." City of Canton, 489 U.S. at 391. This he has failed to do because there is nothing in the summary judgment record establishing a causal link between the Officers' conduct and the City's inaction/omissions.

Cosenza asks this Court to infer causation by virtue of the violations themselves, but what the Officers did or did not do does not create the significant causal link between the City's allegedly deficient training or gaps in policy and Cosenza's convictions. It is acknowledged that, on this record, the City had no written policies in place regarding witness interviews and identifications. But it did have police academy training on these subjects, formal policies regarding reporting, and preferred practices and on-the-job training in place for witness interviews and identifications. E.g., RA-1691-1692, 1694-1695, 1688-1690, 1698, 1702, 1706-1707, 1710. Importantly, as acknowledged by Cosenza's expert, there is repeated evidence that the Officers' conduct was contrary to the training, policies and preferred practices. E.g., RA-1457-1458.

For example, it was a policy of the Worcester Police Department for Officers to write their reports within fifteen (15) days of the relevant interview or interaction. RA-1694. But on this record, and in the light most favorable to Cosenza, Hazelhurst waited months to submit his report regarding the shorts and Horgan's statement regarding them. RA-2297-2299.

Moreover, as to Hazelhurst's initial interview with Horgan, where the identification took place, Cosenza's own expert stated that "[t]he preferred practice was not to have another witness present when obtaining information from the victim or witness. . . . Detective Hazelhurst ignored the best practice when he showed the photo array [to Horgan] in front of Ms. Horgan's two nieces." RA-1457. The expert also stated "the preferred practice was not to share what a witness may have said with the victim . . . . Detective Hazelhurst ignored this preferred practice by relating [sic] Mr. Cosenza's name and the information provided by Robert Payton to Ms. Horgan." RA-1457. The expert further stated that "the preferred practice was to take notes during the interview of a witness so that detective is not relying on his/her memory later. . . . [but] Detective Hazelhurst did not take notes during his interaction with Ms. Horgan." RA-1458.

It is thus clear and undisputed that the Officers did not comply with the preferred practices and policies upon which they had been trained and it defies reason that the City's purportedly inadequate training and policies were "closely

related to [Cosenza's] ultimate injury" when the injury causing actors disregarded

the City's trainings and policies. City of Canton, 489 U.S. at 391 (1989). Cf.

Bannon v. Godin, No. 22-1958, 2024 WL 1715001, at *19-*20 (1st Cir. Apr. 22,

2024) (affirming summary judgment for municipality where allegation was based

on officers colliding with plaintiff's vehicle and the police department policy

"expressly forbids officers from deliberately colliding with suspects' vehicles"); id.

at *31-*33 (Montecalvo, J. concurring) (same).

    As cautioned by the Supreme Court, any failure to strictly apply the

causation requirement will result in *de facto respondeat superior* liability on

municipalities:

> To adopt lesser standards of fault and causation would open municipalities to
> unprecedented liability under § 1983. In virtually every instance where a
> person has had his or her constitutional rights violated by a city employee, a
> § 1983 plaintiff will be able to point to something the city "could have done"
> to prevent the unfortunate incident. Thus, permitting cases against cities for
> their "failure to train" employees to go forward under § 1983 on a lesser
> standard of fault would result in *de facto respondeat superior* liability on
> municipalities - a result we rejected in Monell, 436 U.S., at 693-694, 98 S. Ct.
> at 2037. It would also engage the federal courts in an endless exercise of
> second-guessing municipal employee-training programs. This is an exercise
> we believe the federal courts are ill suited to undertake, as well as one that
> would implicate serious questions of federalism.

City of Canton, 489 U.S. at 391-92 (internal citations omitted).

    It is undisputed that the City had some trainings and policies in place and

that the Officers did not comply with them. As such, Cosenza's evidence fails to

demonstrate that the City's failures were a "moving force" that was "closely

related to the ultimate injury." <u>See</u>, e.g., <u>City of Canton</u>, 489 U.S. at 391 (1989); <u>Santiago v. Fenton</u>, 891 F.2d at 382. Such evidence is a clear predicate to holding the City liable under <u>Monell</u> and its progeny, and given its absence from the summary judgment record, the District Court's allowance of Worcester's Summary Judgment Motion must be affirmed.

## <u>CONCLUSION</u>

For the foregoing reasons, this Court should affirm the District Court's order entering summary judgment in favor of the City. Cosenza has failed to show any evidence, let alone a genuine issue of material fact, that would allow a jury to conclude that the City was deliberately indifferent to the constitutional rights of its citizens, nor is there evidence that any insufficiencies in Worcester's training or policies caused Cosenza's harm.

CITY OF WORCESTER,
By Its Attorneys,


/s/ Douglas T. Radigan
Douglas T. Radigan (BBO #105561)
Brian J. Edmonds (BBO # 1211590)
BOWDITCH & DEWEY, LLP
311 Main Street
P.O. Box 15156
Worcester, MA 01615-0156
Telephone:  508-926-3416
Facsimile:  508-929-3116
Email:  dradigan@bowditch.com
          bedmonds@bowditch.com
*Attorneys for Defendant-Appellee*
*City Of Worcester*

Date: May 7, 2024

## CERTIFICATE OF COMPLIANCE

I, Douglas T. Radigan, certify pursuant to Fed. R. App. P. 32(g) that this brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because the Brief of Defendant-Appellee, City of Worcester, exclusive of the cover page, table of contents, table of authorities, signature block, certificate of compliance, and certificate of service (as allowed by Fed. R. App. P. 32(f)) contains 11,947 words, as verified by the word count function of Microsoft Word, the word-processing system used to prepare this brief. I further certify that this document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 36(a)(6) because this brief has been prepared in Microsoft Word using 14-point Times New Roman font, a proportionally-spaced typeface.

Dated: May 7, 2024

*/s/ Douglas T. Radigan*
Douglas T. Radigan
*Attorney for Defendant-Appellee*
*City of Worcester*

## CERTIFICATE OF SERVICE

I, Douglas T. Radigan, certify that on May 2, 2024, a true and accurate copy

of the foregoing document was electronically filed with the United States Court of

Appeals for the First Circuit by using the CM/EFC system and that all counsel of

record will be served by the CM/EFC system.

Dated: May 7, 2024

*/s/ Douglas T. Radigan*
Douglas T. Radigan
*Attorney for Defendant-Appellee*
*City of Worcester*

## <u>ADDENDUM</u>

TABLE OF CONTENTS

**Page**

## <u>Pleadings</u>

Order and Memorandum on Defendants' Motion for Summary
Judgment (Docket No. 141) – United States District Court, District of
Massachusetts, Case No. 4:18-10936-TSH .............................................RB Add. 1

Judgment in a Civil Case (Docket No. 277) – United States District
    Court, District of Massachusetts, Case No. 4:18-10936-TSH..........RB Add. 31

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

_____

)
NATALE COSENZA,                              )
                                             )              CIVIL ACTION
                  Plaintiff,                 )              NO.  4:18-10936-TSH
                                             )
          v.                                 )
                                             )
CITY OF WORCESTER, Massachusetts,            )
KERRY HAZELHURST, JOHN                       )
DOHERTY, T.J. COAKLEY, MARK                  )
RICHARDSON, ALLAN BURNES,                    )
DANIEL BENEDICT, BRIAN DONOHUE,              )
ROBERT TURGEON, DAVID GRADY,                 )
DARLENE ROCHEFORD, and AS-YET                )
UNKNOWN WORCESTER POLICE                     )
OFFICERS,                                    )
                                             )
                  Defendants.                )
_____ )


**ORDER AND MEMORANDUM ON DEFENDANTS' MOTION FOR SUMMARY
JUDGMENT (Docket No. 125)**

**November 4, 2021**

**HILLMAN, D.J.**

Natale Cosenza brings this § 1983 action against the City of Worcester (the "City") and

numerous Worcester Police Department officers, alleging due process violations (Count I),

malicious prosecution (Count II), and civil conspiracy (Count III).  Two decades ago, Cosenza was

arrested, and ultimately convicted, of state charges stemming from an armed burglary.  He was

sentenced to twelve to twenty years of incarceration.  The victim of the burglary had identified

Cosenza as the perpetrator in a photo array.  In 2016, Cosenza was granted a new trial; a judge

determined that because Cosenza was not allowed to introduce expert testimony on the reliability

of eyewitness identifications at his trial, justice may not have been done.  Cosenza, released from

prison pending the new trial, filed a motion to suppress the identification, which was allowed. The state then filed a nolle prosequi.

Cosenza argues that officers used an impermissibly suggestive identification procedure, which wrongfully implicated him in the crime. Because it was not clearly established at the time of the alleged violation that the identification procedure was unconstitutional, the individual officers are entitled to qualified immunity. Moreover, because the record does not permit a finding that the City was deliberately indifferent in its failure to train officers, the City cannot be held liable for the alleged violation.

Cosenza also asserts that officers suppressed evidence, fabricated evidence, prosecuted him without probable cause, and engaged in a civil conspiracy. Viewing the facts in Cosenza's favor, a jury could find two of the officers liable for suppressing evidence, fabricating evidence, and engaging a civil conspiracy. No jury, however, could find for Cosenza on the malicious prosecution claim, or for Cosenza on the other claims as to the other defendants.[1] Accordingly, the defendants' motion for summary judgment is ***granted*** in part and ***denied*** in part.

## Background

The following facts are drawn from the record, viewed in Cosenza's favor. *See Pippin v. Boulevard Motel Corp.*, 835 F.3d 180, 181 (1st Cir. 2016).

### *1. The Incident*

---

[1] Defendants Burnes, Turgeon, Benedict, Richardson, Coakley, Grady, Donahue, Rocheford, and Doherty argue that their tangential involvement in the investigation cannot support liability under § 1983. Cosenza states that he is no longer pursuing claims against Burnes, Turgeon, Benedict, Richardson, and Coakley. (*See* P Memo at 2 n.1). Indeed, the record does not support liability for these five defendants. *See Calvi v. Knox County*, 470 F.3d 422, 428 (1st Cir. 2006). Accordingly, summary judgment on all claims for Burnes, Turgeon, Benedict, Richardson, and Coakley is granted. The Court will also dismiss Cosenza's claims against the as-yet unknown Worcester police officers. *See Figueroa v. Rivera*, 147 F.3d 77, 83 (1st Cir. 1998).

Around 4 A.M. on August 14, 2000, Melissa Horgan awoke in her Worcester apartment. Crouched beside her bed was a man wearing underwear, a dark t-shirt, and a white covering on his head.  Horgan immediately asked the man who he was and what he was doing there.  Without responding, the man proceeded to beat Horgan with a hard object.  It was dark out, the lights were off, and Horgan was not wearing her glasses.  Some light from the parking lot, however, may have been filtering in through the bottom of her blinds.  Horgan put her hands up to her head to protect herself from the blows.  She pled with the man to stop, telling him he could have whatever he wanted.  The man stopped hitting her but began to climb onto her bed.  Afraid, Horgan kicked the man repeatedly.  He then fled.

Horgan immediately called 911.  She told the operator that a white man in underwear, a t-shirt, and white handkerchief on his head had attacked her.  She said she did not know who the man was and that she had never seen him before.  When asked whether the man had hair, she responded no, or that she did not know.

### 2. *The Response*

Worcester Police Department ("WPD") officers soon arrived.  One of the officers, Daniel Benedict, created an incident report.  Horgan told Benedict that a white man, whom she did not recognize, wearing a dark t-shirt, a white shirt around his head, and white briefs had attacked her. Benedict determined that a window in Horgan's roommate's room, which was empty that night because her roommate was staying elsewhere, was the point of entry, as other access points were locked.  Horgan's roommate was her niece, Emily Banks.  Benedict noted that there was a partial print on the window.  Benedict spoke with Horgan's next-door neighbor, Robert Payton, as officers canvassed the building.  Payton told Benedict that he had not seen or heard anything that night, but that he was having problems with a man, Cosenza, who lived in a neighboring building.

According to Payton, Cosenza had been in Payton's building, knocking on several doors asking for money.  Payton believed that Cosenza had recently gotten into the building by jumping up onto a second-floor, shared balcony.  Benedict listed Cosenza as a suspect in his incident report.

### 3. The Investigation

Darlene Rocheford from WPD's Bureau of Criminal Identification ("BCI") arrived at Horgan's apartment around 5 A.M. to take photographs and dust the scene for prints.  Relative to the window in Banks's room, Rocheford testified at trial that she processed the entire screen, which had been pulled off the window, as well as the windowsill.  She further testified that she "believe[d]" that she "most likely" processed the actual window.  She testified that she did not find any usable prints.

Officers found a wooden rung from a chair in Horgan's bedroom.  Horgan told Benedict that the rung was from one of her chairs but that she had never seen it in her bedroom.  Brian Donahue, one of the other officer's present, placed the rung in a bag for testing.  The rung was later tested for prints by David Grady of the BCI.  Grady processed the rung with a chemical called cyanoacrylate, which Grady described as "a fancy name for Super Glue," and then treated the rung with a magnetic powder.  No prints were uncovered.  About five weeks later, Grady discarded the rung, either because Donahue told him to or because Donahue never came to pick it up.  Grady did not photograph the rung before discarding it.

Later that morning, around 8 A.M., WPD Detective Kerry Hazelhurst was assigned the case.  He read Benedict's incident report and contacted Horgan to arrange a meeting.  Seeing that Cosenza was listed as a suspect in Benedict's incident report, Hazelhurst decided to prepare a photo array with a photograph of Cosenza for Horgan to view.  Hazelhurst pulled Cosenza's

"master card," a record of all contacts a person has with the WPD, for a recent photograph.[2] Hazelhurst also pulled eight photographs of men who had physical characteristics similar to Cosenza.

Horgan was staying with her niece, Rebecca Ritacco, following the attack. Hazelhurst and his partner, Detective John Doherty, met with Horgan at Ritacco's house on the morning of August 15, 2000 to conduct the photo array. Horgan's roommate, Banks, also was there. Horgan was sitting at the kitchen table, visibly shaken from the attack. Hazelhurst did not ask Horgan for a description of her attacker, or whether she was able to get a good look at her attacker, prior to showing her the array. No one there remembers exactly what was said, but Hazelhust testified at the 2001 hearing on Cosenza's motion to suppress that he likely said and did the following:

> Usually what I do is I put the photo array out, I tell them to take their time, look at it carefully, make sure you're certain who you pick out. I always try to impose on them the importance of picking out somebody and let them know that if you say this is the person are you a hundred per cent sure, or we need a positive identification for us to go further. If it's an iffy I.D. it's no good to us.

Hazelhurst elaborated that "it will only work" if they "have a positive I.D;" unless it is a positive I.D., it is "not going to work in a court of law." At the time, the City had no written policies, and provided no formal training to police officers, on how to conduct a photo array.

Hazelhurst laid out the nine photographs, one of which was Cosenza's, on the table. Horgan scanned them over. When she reached Cosenza's photograph, she became hysterical and identified him as her attacker. Taking her emotional reaction as a sign of confidence, Hazelhurst did not ask Horgan how confident she was in her identification. After the identification, Hazelhurst

---

[2] Cosenza's master card lists what appears to be a rather lengthy criminal history. Although the record is clear that Hazelhurst *printed* the master card for a photograph, it is unclear whether Hazelhurst *reviewed* the master card prior to conducting the array.

told Horgan Cosenza's name and that Cosenza lived near her. Hazelhurst asked Horgan to come to the WPD station that afternoon to provide a formal statement.

In the meantime, Hazelhurst, Doherty, and two other officers, T.J. Coakley and Mark Richardson, went to Cosenza's apartment to look for Cosenza. While they were there, Doherty noticed someone riding a bicycle. Doherty identified the person as Cosenza. Doherty testified at trial that the person was about twenty feet away, that Doherty yelled out that he was a police officer and wanted to talk to the person, and that the person looked back and sped away. Coakley testified at his deposition in this case, however, that the person was 200 yards away, that he could not identify the person as Cosenza, and that it was not clear whether the person had even heard Doherty's command. Coakley had grown up about 250 yards from Cosenza's family, but he had not seen Cosenza in over a decade, and he never had seen Cosenza as an adult.

That afternoon, at the station, Hazelhurst took Horgan's statement. According to the statement, which Hazelhurst typed in question-and-answer format as he spoke with Horgan, Horgan stated that a man in brief underwear, a dark t-shirt, and a white t-shirt on his head had attacked her. She also stated that the man was medium height and medium build, with dark medium-to-short length hair. Cosenza had medium-to-short length hair in the photograph used in the array. Cosenza is approximately five foot, three inches and, at least at the time, weighed around 125 pounds. Horgan, who did not know Cosenza's name before the attack, also reported to Hazelhurst that a neighbor who she "realized now was Natale Cosenza" had gone to her next-door neighbor's door with information about the next-door neighbor's stolen motorcycle, asking for reward money. She reported that another time, "this kid (Cosenza) somehow entered the building"

6

and knocked on her door when only Banks was home.[3]  Weeks earlier, when someone had knocked

on Banks' door asking for money, Banks did not know who the person was.

### 4.  The Shorts

Sometime that morning, Horgan's sister and mother went to Horgan's apartment to pick

up personal items for Horgan while Horgan was staying with Ritacco.  Some of the items that

Horgan's sister picked up had been on the floor of Horgan's bedroom.  She put the items in a bag.

The next day, on August 16, 2000, Horgan returned to her apartment with Banks, Hazelhurst, and

Doherty.   Horgan picked up some clothes from her bedroom floor and put them in a bag.

Hazelhurst testified at trial that, while there, he looked for a pair of men's shorts or pants because

the attacker had only been wearing underwear, but that he did not find any.  Horgan testified at her

deposition, however, that she did not recall Hazelhurst looking around the apartment that day.

After picking up the clothes, Horgan continued to stay at Ritacco's house.

Beginning that week, Horgan's nephew, Michael O'Bryant, began staying at Horgan's

apartment to take care of Horgan's cats.  Michael O'Bryant testified at trial that he "didn't touch"

Horgan's room, and that clothes remained on the floor until Horgan came to pick them up

approximately three weeks after he moved in.  A couple of weeks later, over the weekend of

August 26, 2000, another nephew, Matthew O'Bryant, stayed at Horgan's apartment with two

friends, and potentially a couple of others.

---

[3] The full except of the statement read: "My neighbor to my left had his dirt bike stolen
and he had offered a reward to get the bike back.  Another neighbor who I realized now was Natale
Cosenza, went to my neighbor['s] home and stated that he knew where the bike was but needed
the money up front because he was going to go to rehab.  Another time this kid (Cosenza) somehow
entered the building and knocked on our door asking for money.  While he was knocking on the
door, Emily called me at work and told me about it.  I told her not to answer the door.  Emily never
did answer the door so he knocked on my neighbor['s] door and evidently the neighbor told him
to leave, [the neighbor] then checked on Emily to see if she was ok."

On September 13, 2000, Horgan was emptying a bag of clothes from her apartment to do laundry, when she found a pair of men's athletic shorts.  Not recognizing the shorts, she checked with her family to see if the shorts belonged to any of them.  They did not.  She then called Hazelhurst to alert him of the discovery.  Hazelhurst collected the shorts from Horgan that day.  Months later, on February 20, 2001, Hazelhurst took a statement from Horgan at the WPD station regarding the shorts.  Hazelhurst also sent the shorts to the state lab to be tested.  DNA identified from semen stains on the shorts did not match Cosenza.  Hazelhurst wrote an incident report about the shorts on September 17, 2001, over a year after the discovery.

*5. The Conviction*

Cosenza was charged with assault with intent to rape, assault and battery with a dangerous weapon, and burglary on August 16, 2000.  He was arrested on August 29, 2000.  He was indicted by a grand jury in state court on those charges on October 13, 2000.  Cosenza moved to suppress Horgan's identification from the photo array; a judge denied the motion, finding that the array and circumstances surrounding the array were not suggestive.

The Commonwealth relied heavily on Horgan's identification at Cosenza's jury trial.  (*See* Docket No. 133-48, Closing Arguments at 167-70).  The other evidence, which included Doherty's testimony that he saw Cosenza fleeing on his bicycle outside the apartment complex on August 15, 2000, was not strong.  *See Commonwealth v. Cosenza*, 844 N.E.2d 720, 2006 WL 871016, at *2 (Mass. App. Ct. 2006) (unpublished).  Cosenza maintained his innocence; his defense was that Horgan's identification was unreliable and that the shorts found in the bag of clothes taken from her apartment belonged to the real perpetrator.  (*See* Closing Arguments at 154-59).  As to the shorts, the Commonwealth argued that the shorts were left at the apartment by someone staying there after the attack, relying in part on Hazelhurst's testimony that he had searched the apartment

8

RB Add. 8

for men's shorts or pants, to no avail, when he was there on August 16, 2000.  (*See id.* at 173).
Cosenza was convicted of assault and battery with a dangerous weapon and armed burglary.  He
was sentenced to nine to ten years on the assault and battery charge concurrent with a twelve-to-
twenty-year sentence on the armed burglary charge.

### 6.  *The Relief*

Following his convictions, Cosenza moved for a new trial, arguing that his trial counsel
was ineffective for failing to contact and interview two of the guests who stayed at Horgan's
apartment following the attack, and that the trial judge had erred by failing to permit Cosenza to
introduce expert testimony on eyewitness identification; the motion was denied.  In 2006, the
Massachusetts Appeals Court affirmed Cosenza's convictions and the denial of his motion for a
new trial.  *See Cosenza*, 2006 WL 871016, at *1.  In 2015, Cosenza again moved for a new trial,
asserting that a 2013 report from the Study Group on Eyewitness Identification, convened by the
Justices of the Massachusetts Supreme Judicial Court ("SJC"), as well as recent decisions by the
SJC, suggested that expert testimony is necessary to aid a jury in understanding the reliability of
eyewitness identifications.  A judge granted the motion, concluding that because Cosenza was not
allowed to present expert testimony on the reliability of eyewitness identifications, justice may not
have been done at his trial.  On June 3, 2016, Cosenza filed a motion to be released pending further
proceedings; the motion was granted, and Cosenza was released from prison that day.  In advance
of the new trial, Cosenza moved to suppress Horgan's identification.  A judge, different than the
one who granted the new trial, granted the motion, reasoning that the array and identification
procedures were unnecessarily suggestive, and that admission of the identification would deprive
Cosenza of his due process rights under Article 12 of the Massachusetts Declaration of Rights.

Following that order, the Commonwealth filed a nolle prosequi on November 14, 2017, and the case was closed.

In May 2018, Cosenza filed the instant § 1983 action against the City and the WPD officers involved in his investigation.  The defendants now move for summary judgment.

### Legal Standard

Under Federal Rule of Civil Procedure 56, a court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  An issue is "genuine" when a reasonable factfinder could resolve it in favor of the nonmoving party.  *Morris v. Gov't Dev. Bank of Puerto Rico*, 27 F.3d 746, 748 (1st Cir. 1994).  A fact is "material" when it may affect the outcome of the suit.  *Id.*  When ruling on a motion for summary judgment, "the court must view the facts in the light most favorable to the non-moving party, drawing all reasonable inferences in that party's favor."  *Scanlon v. Dep't of Army*, 277 F.3d 598, 600 (1st Cir. 2002) (citation omitted).

### Discussion

Section 1983 provides a cause of action for the "deprivation of any rights, privileges, or immunities secured by the Constitution and laws" by any person acting "under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory."  42 U.S.C. § 1983.  Cosenza brings three claims under § 1983: a claim for deprivation of due process (Count I), a claim for malicious prosecution (Count II), and a claim for civil conspiracy (Count III).[4]

*1. Due Process*

---

[4] The Court previously dismissed Cosenza's claim for failure to intervene (Count IV). (Docket No. 55).

Cosenza asserts three theories of liability on Count I.  He argues that the defendants violated his due process rights by using an unduly suggestive identification procedure, by suppressing and destroying evidence, and by fabricating evidence.  The Court takes each theory in turn.

### a. Identification Theory

The defendants argue that summary judgment is warranted on the identification theory because the photo array was not impermissibly suggestive, and because there was no substantial likelihood of misidentification.[5]  They also argue that the individual defendants are entitled to qualified immunity, and that the City is not liable under *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658 (1978).

### i. Qualified Immunity

"[G]overnment officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."  *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).  The qualified immunity doctrine balances "the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably."  *Pearson v.*

---

[5] Cosenza argues that the state court decision on his 2017 motion to suppress precludes summary judgment on the identification theory.  In Massachusetts, the doctrine of issue preclusion prevents re-litigation of issues "actually litigated and determined" by a valid, final judgment.  *See Jarosz v. Palmer*, 766 N.E.2d 482, 487 (Mass. 2002).  The issue "actually litigated and determined" by the state court was whether the identification procedure violated the Massachusetts constitution.  The issue before this Court is whether the procedure violated the federal constitution.  Those questions are not the same.  *See Commonwealth v. Johnson*, 45 N.E.3d 83, 88 (Mass. 2016); *Commonwealth v. Walker*, 953 N.E.2d 195, 205 n. 13 (Mass. 2011).  Because the permissibility of the identification procedure under the federal constitution was not actually litigated and determined by the state court, the doctrine of issue preclusion does not apply.

*Callahan*, 555 U.S. 223, 231 (2009).  To determine whether a defendant is protected by qualified immunity, a court must decide: "(1) whether the facts alleged or shown by the plaintiff make out a violation of a constitutional right; and (2) if so, whether the right was 'clearly established' at the time of the defendant's alleged violation."  *Maldonado v. Fontanes*, 568 F.3d 263, 269 (1st Cir. 2009).  The Court need not decide these questions in order, *see Pearson*, 555 U.S. at 236, and may resolve the case exclusively at the second step, *see Eves v. LePage*, 927 F.3d 575, 584 (1st Cir. 2019).

The question whether a right was "clearly established" divides into two parts: "(1) 'the clarity of the law at the time of the alleged civil rights violation,' and (2) whether, given the facts of the particular case, 'a reasonable defendant would have understood that his conduct violated the plaintiff['s] constitutional rights.'"  *Barton v. Clancy*, 632 F.3d 9, 22 (1st Cir. 2011) (quoting *Maldonado*, 568 F.3d at 269) (alterations in original).  The "clearly established" inquiry does not require a case directly on point.  *See Gilk v. Cunniffe*, 655 F.3d 78, 81 (1st Cir. 2011).  The "contours of the right," however, "must be sufficiently clear that a reasonable official would understand that what he is doing violates that right."  *Anderson v. Creighton*, 483 U.S. 635, 640 (1987).  In short, "the salient question is whether the state of the law at the time of the alleged violation gave the defendant fair warning that his particular conduct was unconstitutional."  *Maldonado*, 568 F.3d at 269.

Well before the photo array at issue here, the Supreme Court established that an "impermissibly suggestive" photo array giving rise to "a very substantial likelihood of irreparable misidentification" deprives a defendant of due process.  *See Simmons v. United States*, 390 U.S. 377, 384 (1968).  Thus, the law was clear at the time of the alleged violation that an unnecessarily suggestive photo array could violate a defendant's rights.  *See Manson v. Brathwaite*, 432 U.S. 98,

116 (1977); *Neil v. Biggers*, 409 U.S. 188, 198 (1972).  This Court noted as much with respect to the defendants' motion to dismiss.

Whether the contours of that right were clearly defined, such that a reasonable officer would have understood that the identification procedure was impermissibly suggestive, requires further analysis.  Cosenza asserts that the identification procedure was impermissibly suggestive for a variety of reasons.  (*See* Pl. Mem. at 11-13).  First, Hazelhurst should not have conducted a photo array with Cosenza's photograph because Hazelhurst lacked evidence-based suspicion of Cosenza.  Second, the other photographs in the array were picked to match Cosenza's photograph, not Horgan's description of her attacker.  Third, Cosenza was the only person in the array whom Horgan previously may have seen.  Fourth, the array was conducted in the presence of Horgan's roommate, Banks.  Fifth, Hazelhurst did not tell Horgan that the perpetrator may or may not be in the array, that officers would continue their investigation regardless of whether an identification was made, and that the array could be used to clear the innocent.  Sixth, Hazelhurst instructed Horgan that he needed a positive identification "to go further."  Seventh, all photographs in the array were displayed simultaneously, rather than one-by-one.  Eighth, Hazelhurst did not preserve the array, document Horgan's level of certainty, or have Horgan sign an acknowledgment of which photograph she selected.  Finally, Hazelhurst confirmed Horgan's identification afterwards by telling her Cosenza's name and that Cosenza lived near her.

Several of these factors were not understood by courts as contributing to the suggestiveness of photo arrays until after Cosenza's conviction.  *See United States v. Ford*, 683 F.3d 761, 765 (7th Cir. 2012) (photos shown all at once); *United States v. Saunders*, 501 F.3d 384, 388 (4th Cir. 2007) (instruction that array may or may not contain suspect).  Others, alone, do not necessarily

render a procedure impermissibly suggestive.  *See Guillick v. Perrin*, 669 F.2d 1, 4 (1st Cir. 1981) (not improper for police to base photo array on suspicion of defendant).

In disputing qualified immunity, Cosenza relies on *Simmons v. United States*, 390 U.S. 377 (1968).  In *Simmons*, 390 U.S. at 382, officers showed witnesses six photographs of groups of people, several of which included the defendant.  The Supreme Court cautioned that "improper employment of photographs by police *may sometimes* cause witnesses to err in identifying criminals."  *Id.* at 383 (emphasis added).  Even when correct procedures are used, the Court noted, "there is *some danger* that the witness may make an incorrect identification."  *Id.* (emphasis added).  That danger increases, the Court elaborated, "if the police display to the witness only the picture of a single individual who generally resembles the person he saw, or if they show him the pictures of several persons among which the photograph of a single such individual recurs or is in some way emphasized."  *Id.*  The Court concluded that although the procedure used to identify the defendant fell "short of the ideal," in part because the defendant's image recurred in several of the photographs, the defendant's due process rights were not violated given the surrounding circumstances.  *See id.* at 386 & n.6.

*Simmons* does not clearly establish that the identification procedure at issue here was impermissibly suggestive.  Cosenza's photograph arguably was emphasized because Cosenza was the only person in the array whom Horgan previously may have seen.  While troubling, the discussion in *Simmons* on emphasis of a particular photograph is in reference to the photograph itself -- that is, whether the photograph is dissimilar to the others, or whether the defendant's image recurs in several of the photographs.  Other cases relied on by Cosenza share that focus.  *See Foster v. California*, 394 U.S. 440, 443 (1969); *United States v. Lau*, 828 F.2d 871, 875-76 (1st Cir. 1987).  *United States v. Wade*, 388 U.S. 218, 232 (1967), for its part, cautions against using filler

14

photographs of people known to the witness, such that the photograph of the suspect is only person the witness does *not* know.  That did not happen here.

Three of the cases Cosenza cites in which officers were found not to be entitled to qualified immunity are distinguishable.  In *Schand v. City of Springfield*, 380 F. Supp. 3d 106, 120 (D. Mass. 2019), officers showed a witness a Polaroid of the defendant and told the witness that the defendant had been arrested for the alleged murder.  The officers then inserted the Polaroid into a photo array of mug shots, at which point the witness picked out the defendant as the shooter.  *Id.*  In *Gregory v. City of Louisville*, 444 F.3d 725, 733, 746 (6th Cir. 2006), officers employed a one-on-one show-up at a police station with a witness who previously had failed to pick out the defendant from an array.  And in *Rojas v. Iannotto*, 2003 WL 169798, at *4 (S.D.N.Y Jan. 24, 2003), a witness identified the defendant when he was handcuffed, in police custody, and accompanied only by officers.  Those procedures more clearly were established as impermissibly suggestive.  *See United States v. de Jesus-Rios*, 990 F.2d 672, 677 (1st Cir. 1993); *Velez v. Schmer*, 724 F.2d 249, 251 (1st Cir. 1984).  The fourth such case Cosenza cites, *Sanders v. City of Chicago*, 2016 WL 2866097 (N.D. Il. May 17, 2016), is unpersuasive on this point.  There, the court reasoned only that "it has been clearly established since at least 1977 that a criminal defendant has a due process right not be subjected to unduly suggestive identifications that taint his criminal trial."  *Id.* at *10.  While true, more specificity is required.  *See Ashcroft v. al-Kidd*, 563 U.S. 731, 742 (2011).

The Court has not identified any case from before the alleged violation that clearly established the impermissibility of a photo array consisting of nine photographs of similar-looking people, even considering all the factors listed above.  This is not a case where the impermissibility of the defendants' conduct was "so patently evident" that no particular case is needed to have put

a reasonable officer on notice of the conduct's unconstitutionality.[6]  *See Marrero-Méndez v. Calixto-Rodríguez*, 830 F.3d 38, 47 (1st Cir. 2016).  Because, at the time, it was not clearly established that the identification procedure at issue was impermissibly suggestive, such that a reasonable officer would know that Cosenza's due process rights would be violated when an identification resulting from that procedure was used against Cosenza at trial, the individual defendants are entitled to qualified immunity.  Summary judgment for the individual defendants on this theory is granted.

### iv.  Municipal Liability

"It is well established that municipalities may be sued under § 1983 only in limited circumstances."  *Kelley v. LaForce*, 288 F.3d 1, 9 (1st Cir. 2002).  Under § 1983, a municipality may not be held vicariously liable for harm inflicted by the municipality's agents or employees; a municipality may be held liable only when the municipality itself inflicts injury, either through an official custom or policy, or by the municipality's failure to train or supervise its agents or employees.  *See Connick v. Thompson*, 563 U.S. 51, 60-61 (2011); *Monell*, 436 U.S. at 694.  Here, Cosenza maintains that the City is liable both for its express policies and for its failure to train and supervise its officers.[7]

To prevail, Cosenza must demonstrate that the municipality is responsible for the alleged violation.  *Young v. City of Providence*, 404 F.3d 4, 25-26 (1st Cir. 2005).  For his express policy

---

[6] Contrary to the record on the defendants' motion to dismiss, the record on summary judgment does not permit an inference that officers overtly suggested to Horgan that she pick out Cosenza.

[7] To the extent Cosenza's due process claim against the City also stems from alleged fabrication of evidence and suppression of evidence, the record does not support such claims.  There is no evidence that the City had an express policy that caused its officers to fabricate or suppress evidence; nor is there evidence that the City's failure to train its officers caused those alleged violations.  Summary judgment for the City on those theories of liability is granted.

theory, Cosenza must prove that an official policy or custom of the City *caused* his harm.  *See Bd. of Cnty. Comm'rs of Bryan Cnty. v. Brown*, 520 U.S. 397, 404 (1997).  The City must be the "moving force" behind the injury.  *Id.*  For his failure-to-train theory, Cosenza must prove not only that the City's failure to train its officers caused his harm, but also that the failure to train "amount[ed] to deliberate indifference to the rights of persons with whom the police come into contact."  *Canton v. Harris*, 489 U.S. 378, 388 (1989).  A showing of "deliberate indifference" requires "proof that a municipal actor disregarded a known or obvious consequence of his action."  *Bryan Cnty.*, 520 U.S. at 410.  "A plaintiff typically must show a 'pattern of similar constitutional violations by untrained employees . . . to demonstrate deliberate indifference for purposes of failure to train.'"  *Gray v. Cummings*, 917 F.3d 1, 14 (1st Cir. 2019) (quoting *Connick*, 563 U.S. at 62). "Alternatively, liability might be appropriate 'in a narrow range of circumstances where a violation . . . is a highly predictable consequence of a failure to equip law enforcement officers with specific tools to handle recurring situations.'"  *Justiniano v. Walker*, 986 F.3d 11, 21 (1st Cir. 2021) (quoting *Young*, 404 F.3d at 28) (internal quotations omitted).

Cosenza's express policy theory falters at this stage.  According to Cosenza, the City had an express policy of not having a policy on how to conduct a photo array.  Unlike in *Haley v. City of Boston*, 657 F.3d 39, 51-52 (1st Cir. 2011), where the plaintiff alleged an affirmative policy of nondisclosure, the alleged policy here is essentially a reframing of the failure-to-train theory, which requires a more stringent standard of fault, *see Connick*, 563 U.S. at 62.

As to Cosenza' failure-to-train theory, the City's Federal Rule of Civil Procedure 30(b)(6) representative testified at his deposition that the City did not have any policies on how to conduct a photo array and did not train its officers on how to conduct a photo array.  The City had neither formal training nor on-the-job training.  WPD officers were provided "very little guidance" beyond

being told to be careful to select photographs of people with similar characteristics, and generally, not say anything unnecessarily suggestive during the array.  Hazelhurst, for his part, testified at his deposition that he did not believe that he had had any training on how conduct photo array.  Instead, he learned from "watch[ing] the veteran guys work."

According to one of Cosenza's experts, nationally accepted standards for conducting photo arrays at the time included selecting filler photographs based on the witness' description; advising the witness that the suspect may or may not be among the photographs presented; assuring the witness that regardless of whether an identification is made, police will continue to investigate the incident; and asking the witness to state in her own words how certain she is of any identification. These practices, among others, were recommended by a 1999 report produced by the Department of Justice.  Cosenza's expert opined that a problem with relying on on-the-job training, which is at most what Hazelhurst had, is that "if what is taught is contrary, incompatible with, or does not address nationally accepted standards of law enforcement practice, that manner of inappropriate conduct may be perpetuated.  Such was the case with the Worcester Police Department in 2000."

As mentioned, a plaintiff typically must demonstrate a pattern of unconstitutional violations to make out a claim for municipal liability under a failure-to-train theory, *see Gray*, 917 F.3d at 14, and here, Cosenza has made no such showing.  Cosenza nonetheless argues that a jury reasonably could find that municipal liability is appropriate.  In *Canton*, 489 U.S. at 390 n.10, the Supreme Court noted that a city's arming its officers with firearms to arrest fleeing felons meant that the need to train officers in the constitutional limitations on the use of deadly force "can be said to be 'so obvious,' that failure to do so could properly be characterized as 'deliberate indifference' to constitutional rights."  In *Connick*, 563 U.S. at 64, the Supreme Court described *Canton* as hypothesizing a "narrow range" or "single-incident liability" for municipalities.  The

Court then held that a municipality's failure to train prosecutors in their *Brady* obligations did not fall within that range. *Id.* Because attorneys are trained in the law prior to becoming attorneys, "recurring constitutional violations are not the 'obvious consequence' of failing to provide prosecutors with formal in-house training about how to obey the law." *Id.* (quoting *Bryan Cnty.*, 520 U.S. at 409).

Following *Canton* and *Connick*, several courts have held that municipalities' failure to train police officers, who are not trained in the law, on their *Brady* obligations can lead to single-incident liability. *See Echavarria v. Roach*, 2021 WL 4480771, at *26 (D. Mass. Sept. 30, 2021); *Crews v. County of Nassau*, 996 F. Supp. 2d 186, 210 (E.D.N.Y. 2014). Cosenza argues that identification procedures, like *Brady* obligations, are at the core of criminal prosecutions, such that a failure to train officers on how to conduct photo arrays leads to the highly predictable consequence of tainted identifications corrupting criminal trials. Cosenza has not identified a case, however, and the Court is aware of none, that has extended *Canton*'s hypothesized single-incident liability to encompass training on identification procedures. Because municipal liability based on a single alleged violation is reserved for a "narrow range of circumstances," *Connick*, 563 U.S. at 63, not apparently applicable here, summary judgment for the City on this theory is granted, *see Gray*, 917 F.3d at 14; *Hill v. Walsh*, 884 F.3d 16, 24 (1st Cir. 2018).

*b. Suppression Theory*

The defendants argue that summary judgment is warranted on the suppression theory because Cosenza cannot prove that evidence was suppressed, or that a due process violation occurred.[8] Cosenza contends that Hazelhurst, Doherty, Rocheford, Donahue, and Grady withheld and destroyed exculpatory evidence.

---

[8] The defendants do not develop an argument on qualified immunity as to this theory.

### i. Withheld Evidence

A prosecutor who fails to disclose to a criminal defendant favorable and material evidence in the prosecutor's possession violates the defendant's due process rights, irrespective of whether the prosecutor acted in good or bad faith.  *See Drumgold v. Callahan*, 707 F.3d 28, 38 (1st Cir. 2013).   While this responsibility lies with the prosecutor, "law enforcement officers have a correlative duty to turn over to the prosecutor any material evidence that is favorable to the defendant." *Id.*  "Evidence is favorable to a defendant if it is either exculpatory or impeaching in nature." *Id.*  Evidence is material if it "undermines confidence in the verdict," or by "any reasonable likelihood," could have "affected the judgment of the jury." *Wearry v. Cain*, 577 U.S. 385, 392 (2016) (citations omitted).  To prevail in a § 1983 action, a plaintiff also "must demonstrate by a preponderance of the evidence a causal link between the *Brady* violation and his conviction." *Drumgold*, 707 F.3d at 48; *see also Rodriguez-Cirilo v. Garcia*, 115 F.3d 50, 52 (1st Cir. 1997).  This "factual causation inquiry essentially replicates the materiality inquiry with a heightened burden of proof." *Drumgold*, 707 F.3d at 49.

Cosenza asserts that the defendants withheld three pieces of evidence: (1) that Cosenza did not flee from officers on a bicycle the day after the attack; (2) that officers provided Horgan with information about Cosenza to fabricate her statement following the photo array; and (3) that no officer at Horgan's apartment searched for clothing worn by the perpetrator.  As an initial matter, Cosenza's argument is premised on the assumption that a jury reasonably could find these facts as true, and that the information was not already disclosed.  A review of the record sorts reasonable inference from conjecture.

Doherty testified at trial that he observed Cosenza riding a bicycle the day after the attack. Doherty testified that he was about twenty feet away from Cosenza, and that when he called out

to Cosenza, Cosenza fled.  Cosenza suggests that this was a lie because Coakley, another officer at the scene, testified in his deposition that he could not identify the bicyclist, or whether the bicyclist was trying to evade the officers, because the bicyclist was 200 yards away.  Coakley did not testify that the bicyclist was *not* Cosenza, nor did he dispute that the bicyclist may have been trying to evade the officers.  Thus, the only real inconsistency between Coakley's and Doherty's testimony was the distance between the officers and the bicyclist.  *See LaFrenier v. Kinery*, 550 F.3d 166, 167-68 (1st Cir. 2008).  Nonetheless, a jury could believe Coakley over Doherty and find that the bicyclist was in fact 200 yards away from the officers.  This fact was not disclosed to Cosenza.

Horgan's statement described her attacker as having medium-to-short, dark hair; it also detailed incidents involving Cosenza and her neighbor, Payton, and her roommate, Banks.  First, it was disclosed -- in the statement itself -- that Horgan gave the statement after the photo array, and thus, after Horgan had seen a photograph of Cosenza with medium-to-short, dark hair.  Second, it was disclosed -- at the 2001 hearing on the motion to suppress -- that Hazelhurst "probably" told Horgan that Cosenza lived in a building next to hers, and that Hazelhurst "might have" told Horgan Cosenza's name.  What was not disclosed, and what the record suggests by reasonable inference actually happened, was that Hazelhurst told Horgan that Cosenza was the person who had been in her building asking for money.  While Horgan may have heard from Payton himself that his motorcycle had been stolen, and from Banks herself that someone had knocked on their door, a jury could infer that she would not have known that Cosenza was that person, prior to even knowing his name.  This specific piece of information -- the extent to which Hazelhurst told Horgan about Cosenza -- was not disclosed to Cosenza.

Hazelhurst testified at trial that when he went to Horgan's apartment on August 16, 2000, he was looking to see if anything was out of place, "especially a pair of men's shorts or pants." Only two pieces of evidence in the summary judgment record suggest, even remotely, that this was not true. First, Hazelhurst failed to document, in a police report written on August 16, 2000, that he looked for shorts in Horgan's apartment. This lack of documentation, however, was disclosed. Indeed, Cosenza's trial counsel used the lack of documentation to impeach Hazelhurst's testimony. Second, Horgan testified at her deposition that she did not recall officers searching for clothing at her apartment on August 16, 2000. Horgan added, however, "I just don't recall that whole thing, I just don't recall." Horgan's lack of memory about this specific visit to her apartment does not render Hazelhurst's testimony about the visit false. Cosenza has pointed to nothing in the record not already disclosed that reasonably suggests -- beyond conjecture -- that Hazelhurst withheld information about looking for men's shorts at Horgan's apartment.

Thus, drawing all reasonable inferences in Cosenza's favor, a jury would be warranted in finding that Hazelhurst and Doherty withheld information about the distance between officers and the bicyclist on the day after the attack and the extent to which Hazelhurst shared information about Cosenza with Horgan following the photo array. A jury would not be warranted in finding that Hazelhurst withheld information regarding looking for shorts at Horgan's apartment on August 16, 2000, as that argument rests on speculation and conjecture. The information about the distance between the officers and the bicyclist is exculpatory because it could have been used to impeach Doherty's testimony that he identified the bicyclist as Cosenza. Likewise, the information concerning what was provided to Horgan about Cosenza after the array is exculpatory because it could have been used to further demonstrate the unreliability of her identification, insofar as it tended to prove that her confidence in her selection was artificially inflated.

22

A jury also could find this information material.  Testimony that Cosenza fled from officers the day after the attack was circumstantial evidence of Cosenza's guilt.  *See United States v. Harris*, 660 F.3d 47, 52 (1st Cir. 2011).  Horgan's identification of Cosenza, moreover, was the Commonwealth's center piece.  The prosecutor highlighted both in his closing.  A jury reasonably could conclude that this information, by "any reasonable likelihood," could have affected the judgment of the jury.  *See Wearry*, 577 U.S. at 392.

To the extent the § 1983 causation standard on the suppression theory is essentially the materiality standard with a heightened burden of proof, *see Drumgold*, 707 F.3d at 49, Cosenza must prove that it is more likely than not that the information could have affected the judgment of the jury, or in other words, that it is more likely than not that the information undermines the confidence of his conviction, *see Wearry*, 577 U.S. at 392.  Because the information about Horgan's statement tends to undermine the only direct evidence against Cosenza, and because Doherty's testimony about Cosenza fleeing, a piece of circumstantial evidence, was otherwise uncontradicted, it would not be unreasonable for a jury to find the causation standard met here.  Thus, summary judgment as to Hazelhurst and Doherty on the suppression theory is denied.

*ii.  Destroyed Evidence*

A police officer who fails to preserve evidence "of which no more can be said than that it could have been subjected to tests, the results of which might have exonerated the defendant" violates a criminal defendant's due process rights only if the officer acted in bad faith.  *See Arizona v. Youngblood*, 488 U.S. 51, 57-58 (1988); *Olszewski v. Spencer*, 466 F.3d 47, 56 (1st Cir. 2006).

Cosenza maintains that Rocheford destroyed, or at least failed to preserve, a fingerprint that Benedict had found at the scene, and that Grady and Donahue destroyed the suspected weapon, the chair rung.  Neither the fingerprint nor the chair rung was "apparently exculpatory," *Magraw*

*v. Roden*, 743 F.3d 1, 8 (1st Cir. 2014), and Cosenza does not argue otherwise.  Accordingly, to survive summary judgment, the record must support an inference that the fingerprint or rung were destroyed in bad faith.

Benedict, one of the first officers on the scene on the night of the attack, indicated that he found a partial print on the window believed to be the point of entry for the perpetrator.  Rocheford testified at trial that she had processed the scene for prints but did not find anything usable.  She further testified that she "most likely" processed the glass portion of the window.  At her deposition in this case, however, she conceded that she could not say with certainty whether she indeed processed the glass portion of the window.  Donahue picked up the chair rung from Horgan's apartment and brought it to Grady for processing.  Grady tested the rung for fingerprints, without success, by applying a superglue-like material and magnetic powder.  Grady discarded the rung five weeks later.  Grady's discarding of the rung, as well as his failure to photograph it, deviated from nationally accepted standards, including the usual practice of the WPD.

Even if Rocheford did not test the glass portion of the window for prints, and Grady, potentially at Donahue's direction, discarded the rung without photographing it, there is no evidence of bad faith.  *See United States v. Zaragoza-Moreira*, 780 F.3d 971, 977 (9th Cir. 2015) ("The presence or absence of bad faith turns on the government's knowledge of the apparent exculpatory value of the evidence at the time it was lost or destroyed, because without knowledge of the potential usefulness of the evidence, the evidence could not have been destroyed in bad faith.").  Accordingly, summary judgment as to Rocheford, Grady, and Donahue on this theory is granted.

*c.  Fabrication Theory*

Cosenza's third due process theory is that the defendants fabricated evidence against him. While the defendants moved for summary judgment "on the entirety of Plaintiff's due process claim, Count I," the defendants did not specifically address the fabrication theory in their memorandum in support of summary judgment. For this reason, Cosenza asserts that summary judgment on the fabrication theory should be denied.

A party seeking summary judgment "bears the initial burden of informing the district court of the basis for its motion." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The burden may be "discharged by 'showing' -- that is, pointing out to the district court -- that there is an absence of evidence to support the nonmoving party's case." *Id.* at 325. The core of Cosenza's fabrication theory is alleged in Paragraphs 79 and 80 of the Second Amendment Complaint. Those paragraphs, under the heading "Count I," allege that the defendants "fabricated and solicited evidence that they knew to be false, including but not limited to witness identifications, statements, and testimony that they knew to be false," and "produced a series of false and fraudulent reports and related documents." With respect to that theory of liability, the defendants did not "put the ball in play," *Garside v. Osco Drug, Inc.*, 895 F.2d 46, 48 (1st Cir. 1990), by averring an absence of evidence.

The defendants do so only briefly in their reply memorandum, asserting that the three pieces of evidence Cosenza contends were fabricated in his opposition are mere allegations resting on unsupported speculation. As the preceding discussion on Cosenza's suppression theory makes clear, the Court is skeptical of the extent to which the record permits reasonable inferences that each of the alleged fabricated statements indeed was fabricated to the extent claimed. Nonetheless, the defendants' argument on the fabrication theory is forfeited for purposes of the pending motion. *See Noonan v. Wonderland Greyhound Park Realty LLC*, 723 F. Supp. 2d 298, 349 (D. Mass.

2010).   The Court declines to grant summary judgment on this theory as to Hazelhurst and Doherty.[9]

### 3.  Malicious Prosecution

Cosenza brings a § 1983 claim for malicious prosecution.   The defendants argue that Cosenza cannot prove the claim as a matter of law, and that they are entitled to qualified immunity. In a § 1983 claim for malicious prosecution, a plaintiff must show that the defendant caused "a seizure of the plaintiff pursuant to legal process unsupported by probable cause," and that criminal proceedings terminated in the plaintiff's favor.  *See Hernandez-Cuevas v. Taylor*, 723 F.3d 91, 101 (1st Cir. 2013) (quoting *Evans v. Chalmers*, 703 F.3d 636, 647 (4th Cir. 2012)).   The defendants maintain that Cosenza's seizure was supported by probable cause.   In response, Cosenza argues that probable cause was lacking because Horgan's identification was false and obtained by unduly suggestive procedures, and because other evidence was fabricated.

"Probable cause for an arrest exists when the arresting officer, acting upon apparently trustworthy information, reasonably concludes that a crime has been (or is about to be) committed and that the putative arrestee likely is one of the perpetrators."  *Acosta v. Ames Dep't Stores, Inc.*, 386 F.3d 5, 9 (1st Cir. 2004).   Probable cause is measured "at the time of the arrest," *Holder v. Town of Sandown*, 585 F.3d 500, 504 (1st Cir. 2009), and from the standpoint of an objectively reasonable officer, *see Maryland v. Pringle*, 540 U.S. 366, 371 (2003).   *See also Michigan v.*

---

[9] As mentioned, Rocheford, Grady, and Donahue argue that they are entitled to summary judgment on all claims given their tangential involvement in the investigation.  Cosenza does not specifically address their argument; instead, he implicates Rocheford, Grady, and Donahue directly only on the suppression theory, (Pl. Mem. at 23), and the conspiracy claim, (Pl. Mem. at 30).  As to the fabrication theory, he implicates only Hazelhurst and Doherty.  (Pl. Mem. at 21). Discerning no evidence in the record to support liability for Rocheford, Grady, and Donahue on the fabrication theory, and given that their argument of tangential involvement applies to all claims, summary judgment as to Rocherford, Grady, and Donahue on the fabrication theory is granted.

*DeFillippo*, 443 U.S. 31, 37-38 (1979).  Qualified immunity attaches "'so long as the presence of probable cause is at least arguable.'"  *Abreu-Guzman v. Ford*, 241 F.3d 69, 73 (1st Cir. 2001) (quoting *Prokey v. Watkins*, 942 F.2d 67, 72 (1st Cir. 1991)).

"Probable cause can be based on a single identification from a credible eyewitness."  *Hart v. Mannina*, 798 F.3d 578, 588 (7th Cir. 2015); *see also Mitchell v. City of Boston*, 130 F. Supp. 2d 201, 216 (D. Mass. 2001).  Even an allegedly unreliable identification may be "trustworthy enough that a reasonably prudent person would rely on it in forming a belief about the suspect's conduct."  *Robinson v. Cook*, 706 F.3d 25, 34 (1st Cir. 2013); *see also Goodwin v. Conway*, 836 F.3d 321, 329 (3d Cir. 2016).

Here, to recap the pertinent facts, drawing all reasonable inferences in Cosenza's favor: Hazlehurst created an array of nine photographs of similar-looking men.  Although Hazlehurst did not have independent, evidence-based suspicion of Cosenza, he included Cosenza's photograph in the array because Cosenza was listed as a suspect in Benedict's incident report.  Cosenza was the only individual pictured in the array who lived near Horgan.  Hazlehurst laid the array out on a table at Horgan's niece's house, while Banks, Horgan's roommate, was present.  Hazlehurst stressed the importance of picking someone out, explaining to Horgan that he needed a positive identification to go further, and that an "iffy" identification was no good.  Horgan, who was emotional to begin with, had a visible, distinct reaction to seeing Cosenza's photograph.  She identified him as her attacker.

Probable cause based on this identification, without more, was at least arguable.  *See Acosta*, 386 F.3d at 10 (uncorroborated testimony of a victim ordinarily can support a finding of probable cause).  Adding to the calculus, Benedict's incident report, which Hazlehurst reviewed, stated that Horgan's neighbor, Payton, believed that Cosenza had recently gained access to the

building by jumping onto the balcony from the first floor, and that Cosenza had been knocking on several doors in the building looking for money. Although not much, a reasonably prudent person with this information, plus Horgan's identification, would be warranted in the belief that Cosenza likely committed the crime. *See United States v. Winchenbach*, 197 F.3d 548, 556 (1st Cir. 1999) (officer's conclusion that probable cause exists need only be reasonable).

The existence of probable cause is amenable to summary judgment when the *material* facts are not in dispute. *See Acosta*, 386 F.3d at 9; *see also Almeida v. Rose*, 55 F. Supp. 3d 200, 204 (D. Mass. 2014) (dismissal of § 1983 malicious prosecution claim appropriate due to victim's positive photo identification, despite other allegations). Because, on these facts, no reasonable jury could find that probable cause was not at least arguable, entitling the officers to qualified immunity, summary judgment is warranted.[10]

### 4. Conspiracy

Cosenza asserts a § 1983 claim for conspiracy. The defendants argue that Cosenza has no reasonable expectation of proving this claim. In response, Cosenza asserts that Hazelhurst, Doherty, Rocheford, Grady, and Donahue conspired against him by, among other things, suppressing and fabricating evidence to implicate him in the crime.[11]

---

[10] To the extent Cosenza still maintains that the City is liable for its officers' alleged malicious prosecution, and it does not appear that he does, (*see* Pl. Mem. at 37-40), the record does not support municipal liability in this way. There is no evidence that the City had an express policy that caused it officers to effect seizures unsupported by probable cause; nor is there evidence that the City's failure to train its officers caused its officers to effect seizures unsupported by probable cause. Summary judgment for the City on this claim is granted.

[11] Cosenza mentions Coakley as well, but elsewhere in his memorandum, Cosenza expressly states that he is not pursuing claims against Coakley. In any event, due to Coakley's tangential involvement in the investigation, noted *supra*, summary judgment is granted in his favor.

A claim for civil conspiracy under § 1983 requires showing a "conspiratorial agreement" "to commit an unlawful act, or to commit a lawful act by unlawful means," *Sánchez v. Foley*, 972 F.3d 1, 11 (1st Cir. 2020) (quoting *Estate of Bennett v. Wainwright*, 548 F.3d 155, 178 (1st Cir. 2008), and an "actual abridgment of some federally-secured right," *Nieves v. McSweeney*, 241 F.3d 46, 53 (1st Cir. 2001). To establish the agreement element of the conspiracy, a plaintiff must prove either the existence of a "single plan," or that "the parties decide[d] to act interdependently, each actor deciding to act only because he was aware that the others would act similarly." *Sánchez*, 872 F.3d at 12 (quoting *Aubin v. Fudala*, 782 F.3d 280, 286 (1st Cir. 1983)). "[T]he agreement that rests at the heart of a conspiracy is seldom susceptible of direct proof: more often than not such an agreement must be inferred from all the circumstances." *Earle v. Benoit*, 850 F.2d 836, 843 (1st Cir. 1988). Such inferences, however, must be based on more than speculation and conjecture. *Sánchez*, 972 F.3d at 12.

The Court already has concluded that a jury reasonably could find a *Brady* violation based on Hazelhurst and Doherty's failure to disclose the distance between officers and the bicyclist and the extent of information shared with Horgan after the array. Based on the surrounding circumstances, a jury also could infer an agreement between Hazelhurst and Doherty not to disclose this information. Doherty was with Hazelhurst when Hazelhurst conducted the array, and Hazelhurst was with Doherty when Doherty identified Cosenza as the bicyclist. Following Doherty's identification, moreover, Hazelhurst created a "wanted" poster describing Cosenza as having fled from the apartment complex upon seeing the police. A jury reasonably could infer from this evidence that Hazelhurst and Doherty planned to act in concert to implicate Cosenza in the crime by suppressing exculpatory, material information. Accordingly, summary judgment on Cosenza's conspiracy claim as to Hazelhurst and Doherty is denied.

Cosenza's argument that Rocheford, Grady, and Donahue joined in this agreement too, however, is based on speculation and conjecture. Rocheford and Donahue's involvement in the investigation was limited to responding to the crime scene shortly after the attack. Rocheford processed the scene for prints, without luck, even though Benedict had observed a partial print on what was thought to be the point of entry. Donahue took the chair rung, the suspected assault weapon, from the apartment and brought it to Grady, who processed it for fingerprints and, some five weeks later, discarded it, potentially at Donahue's direction. As discussed, these actions do not independently make out constitutional violations. These actions also do not support an inference that Rocheford, Grady, and Donahue agreed to implicate Cosenza in the crime by fabricating or suppressing evidence. Indeed, there is no indication in the record that Rocheford, Grady, and Donahue were even aware of the photo array, the incident with the bicyclist, or Horgan's statement. Thus, summary judgment on this count as to Rocheford, Grady, and Donahue is granted.

### Conclusion

The defendants' motion for summary judgment (Docket No. 125) is ***granted*** with respect to defendants City of Worcester, Coakley, Richardson, Burnes, Benedict, Donahue, Turgeon, Grady, and Rochford on all claims. The motion is ***granted*** with respect to defendants Hazelhurst and Doherty on Count I - Identification Theory and Count II. The motion is ***denied*** with respect to defendants Hazelhurst and Doherty on Count I - Suppression Theory, Count I - Fabrication Theory, and Count III.

**SO ORDERED**

*/s/ Timothy S. Hillman*
**TIMOTHY S. HILLMAN**
**DISTRICT JUDGE**

UNITEDSTATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

Natale Cosenza,

               Plaintiff,

        v.                                CIVIL ACTION NO. 18-10936-TSH

Kerry Hazelhurst and
John Doherty,

               Defendants,

**JUDGMENT IN A CIVIL CASE**

Hillman, D.J.

x       **Jury Verdict.**  This action came before the court for a trial by jury.  The issues have been tried and the jury has rendered its verdict.

       **Decision by the Court**.  This action came to trial before the Court. The issues have been tried and a decision has been rendered.

       **IT IS ORDERED AND ADJUDGED: in accordance with the Jury Verdict, dated 9/30/22, that judgment be entered in favor of the plaintiff and against the defendants in the amount of $8,000,000.00 plus punitive damages against the defendant Kerry Hazelhurst in the amount of $25,000.00 and against the defendant John Doherty in the amount of $5,000.00.**

                               Robert Farrell, CLERK

Dated:  1/9/23                 /S/ Martin Castles
                               ( By ) Deputy Clerk